# Exhibit A



# COMMONWEALTH of VIRGINIA

POST OFFICE BOX 2452

## *Secretary of the Commonwealth*

RICHMOND, VIRGINIA 23218-2452

## NOTICE OF SERVICE OF PROCESS

Patent Quality Assurance, LLC
Northwest Registered Agent, LLC
25 First Avenue SW, Suite A
Watertown, SD 57021

2/9/2024

VLSI Technology LLC

vs.

Patent Quality Assurance, LLC

**Summons and Complaint**

**Request for Production of Documents, Interrogatories, Requests for Admissions**

Dear Sir/Madam:

You are being served with the enclosed notice under section 8.01-329 of the Code of Virginia which designates the Secretary of the Commonwealth as statutory agent for Service of Process.

If you have any questions about the matter, PLEASE contact the CLERK of the enclosed/below mentioned court or any attorney of your choice. Our office does not accept payments on behalf of debts. The Secretary of the Commonwealth's ONLY responsibility is to mail the enclosed papers to you.

COURT:

Alexandria Circuit Court
Courthouse
520 King Street, Ste 307
Alexandria, VA 22314

Service of Process Clerk
Secretary of the Commonwealth's Office

**AFFIDAVIT FOR SERVICE OF PROCESS ON THE SECRETARY OF THE COMMONWEALTH**

Case No. VLSI Technology LLC v. Patent Quali

Commonwealth of Virginia    VA CODE §§ 8.01-301, -310, -329; 55-218.1; 57-51

Alexandria Circuit Court ........................... Circuit Court

| VLSI Technology LLC | v. | Patent Quality Assurance, LLC |
|---|---|---|
| 150 South Wacker Drive Suite 2400 | | Northwest Registered Agent, LLC 25 First Avenue SW, Suite A |
| Chicago, IL, 60606 | | Watertown, SD, 57021 |

TO THE PERSON PREPARING THIS AFFIDAVIT: You must comply with the appropriate requirements listed on the back of this form.

| Attachments: | [•] Summons and Complaint | [ ] Notice |
|---|---|---|
| | | [•] Requests for Production of Documents, Interrogatories, Requests for Admissions |

I, the undersigned Affiant, state under oath that
[×] the above-named defendant    [ ]
whose last known address is    [×] same as above [ ]
1.  [×] is a non-resident of the Commonwealth of Virginia or a foreign corporation and Virginia Code § 8.01-328.1(A) applies (see NON-RESIDENCE GROUNDS REQUIREMENT on page 2).
2.  [ ] is a person whom the party seeking service, after exercising due diligence, has been unable to locate (see DUE DILIGENCE REQUIREMENT ON BACK)

_____ is the hearing date and time on the attached process or notice (if applicable).

February 5, 2024    _Ghd.—_

DATE    [ ] PARTY [✓] PARTY'S ATTORNEY [ ] PARTY'S AGENT [ ] PARTY'S REGULAR AND BONA FIDE EMPLOYEE

State of Virginia    [×] City [ ] County of Alexandria

Acknowledged, subscribed and sworn to before me this day by    Ellen D. Marcus

2/5/24    _Shut M. G—_    PRINT NAME OF SIGNATORY

DATE    [ ] CLERK    [ ] MAGISTRATE    [×] NOTARY PUBLIC

Notary Registration No.    My commission expires

SHEILA M. COSTIN
NOTARY
PUBLIC
REG. # 177503
MY COMMISSION
EXPIRES
06/30/2025
COMMONWEALTH OF VIRGINIA

[ ] Verification by the clerk of court of the date of filing of the certificate of compliance is requested. A self-addressed stamped envelope is provided to the clerk at the time of filing this Affidavit.

NOTICE TO THE RECIPIENT from the Office of the Secretary of the Commonwealth of Virginia:
You are being served with this notice and attached pleadings under Section 8.01-329 of the Code of Virginia which designates the Secretary of the Commonwealth as statutory agent for Service of Process. The Secretary of the Commonwealth's ONLY responsibility is to mail, by certified mail, return receipt requested, the enclosed papers to you. If you have any questions concerning these documents, you may wish to seek advice from a lawyer.
SERVICE OF PROCESS IS EFFECTIVE ON THE DATE WHEN SERVICE IS MADE ON THE SECRETARY OF THE COMMONWEALTH.

**CERTIFICATE OF COMPLIANCE**
I, the undersigned, Clerk in the Office of the Secretary of the Commonwealth, hereby certify the following:
FEB 09 2024
1.  On _____ , legal service in the above-styled case was made upon the Secretary of the Commonwealth, as statutory agent for persons to be served in accordance with Section 8.01-329 of the Code of Virginia, as amended.
FEB 12 2024
2.  On _____ , papers described in the Affidavit and a copy of this Affidavit were forwarded by certified mail, return receipt requested, to the party designated to be served with process in the Affidavit.

SERVICE OF PROCESS CLERK, DESIGNATED
BY THE AUTHORITY OF THE SECRETARY OF THE COMMONWEALTH

## NON-RESIDENCE GROUNDS REQUIREMENT:

If box number 1 is checked, insert the appropriate subsection number:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

1.  Transacting any business in this Commonwealth;

2.  Contracting to supply services or things in this Commonwealth;

3.  Causing tortious injury by an act or omission in this Commonwealth;

4.  Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth;

5.  Causing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth when he might reasonably have expected such person to use, consume, or be affected by the goods in this Commonwealth, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth;

6.  Having an interest in, using, or possessing real property in this Commonwealth;

7.  Contracting to insure any person, property, or risk located within this Commonwealth at the time of contracting;

8(ii). Having been ordered to pay spousal support or child support pursuant to an order entered by any court of competent jurisdiction in this Commonwealth having *in personam* jurisdiction over such person; or

10. Having incurred a liability for taxes, fines, penalties, interest, or other charges to any political subdivision of the Commonwealth.

## DUE DILIGENCE REQUIREMENT:

If box number 2 is checked, the following provision applies:

When the person to be served is a resident, the signature of an attorney, party or agent of the person seeking service on such affidavit shall constitute a certificate by him that process has been delivered to the sheriff or to a disinterested person as permitted by § 8.01-293 for execution and, if the sheriff or disinterested person was unable to execute such service, that the person seeking service has been unable, after exercising due diligence, to locate the person to be served.

# Commonwealth of Virginia



Case No. CL24001093
Doc No: 3825164

# SUMMONS

## TO THE SHERIFF: YOU ARE HEREBY COMMANDED TO SERVE:

Patent Quality Assurance LLC
Serve: Secretary of the Commonwealth, Statutory Agent
P.O. Box 2452
Richmond, VA 23218

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**Appearance in person is not required by this summons.**

Done in the name of The Commonwealth of Virginia, the 5th day of February, 2024.

Margaret Chatman
Deputy Clerk

Greg Parks
Clerk, Circuit Court
520 King Street #307
Alexandria, VA 22314
(703) 746-4044

Copy to Serve

COMMONWEALTH OF VIRGINIA.
In the Circuit Court of the City of Alexandria

STYLE: VLSI TECHNOLOGY LLC V PATENT QUALITY ASSURANCE LLC

Patent Quality Assurance LLC
Serve: Secretary of the Commonwealth, Statutory Agent
P.O. Box 2452
Richmond, VA 23218

Copy to Serve

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA

**VLSI TECHNOLOGY LLC,**

150 South Wacker Drive, Suite 2400
Chicago, IL 60606

      **Plaintiff,**

   v.

**PATENT QUALITY ASSURANCE, LLC,**

Last known address of person to be served:
Northwest Registered Agent, LLC
25 First Avenue SW, Suite A
Watertown, SD 57021

**AND**

**JOSEPH URADNIK,**

Last known address of person to be served:
Joseph Uradnik
30177 Arrowhead Road
Grand Rapids, MN 55744

      **Defendants.**

Civil Action No. _CL24001093_



## COMPLAINT

Plaintiff VLSI Technology LLC ("VLSI"), by and through its undersigned counsel, pleads

the following against defendants Patent Quality Assurance, LLC ("PQA") and Joseph Uradnik

("Uradnik") (collectively, the "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1.     This is an action for abuse of process, fraud, and civil conspiracy arising out of

Defendants' scheme to wrongly use an administrative trial proceeding called *inter partes* review

("IPR"), and its processes and procedures, to harass and attempt to extort tens of millions of dollars

from VLSI, rather than for the proper purpose of obtaining review of the patentability of one or more patent claims.

2.      Months after VLSI was awarded one of the largest patent infringement verdicts in history against Intel Corporation ("Intel") for infringement of two VLSI patents, PQA initiated IPR proceedings before the Patent Trial and Appeal Board (the "PTAB"). Uradnik and PQA then prosecuted the case, misusing PTAB processes and procedures in an attempt to pressure VLSI to pay them millions of dollars to drop the case. That was their true purpose: to extract money from VLSI, not to have the validity of VLSI's patent claims determined.

3.      PQA did not even exist before VLSI's verdict. PQA has no legitimate interest in the validity of any VLSI patent. It does not make, use, or sell any products. It faces no risk of being sued for patent infringement. Defendants abused discovery and other procedures of the PTAB throughout the IPR proceeding by refusing to reveal the true nature of PQA, who or what was behind it, and their actual motivations in pursuing an IPR against VLSI.

4.      Uradnik has no legitimate interest in the patentability of VLSI's patents, either. Throughout the proceedings, he steadfastly refused to identify himself as anyone other than an "authorized representative" of PQA. Even after being asked repeatedly at his deposition to testify as to the true nature of his relationship with PQA, and to identify the people behind PQA and their interests, he refused to answer.

5.      Defendants' true purpose was extortion. Their repeated abuses of the processes and procedures of the IPR revealed that purpose, including: (a) falsely representing to the PTAB that PQA had an "exclusive" relationship with an expert in order to get a competing IPR petition dismissed; (b) threatening to file, and then actually filing, a second IPR petition when VLSI refused to pay the exorbitant sums of money that Defendants demanded to drop the case; (c) engaging in

brazen discovery misconduct to keep the identity of PQA's principals, and the true purposes for its creation, hidden from VLSI and the PTAB; and (d) willfully and repeatedly violating the discovery orders of the Director of the U.S. Patent and Trademark Office (the "USPTO") directing PQA to reveal its true nature and origins.

6.  As a direct result of Defendants' abusive tactics, VLSI was forced to defend against an abusive IPR petition and engage in needless discovery, causing VLSI damages including attorneys' fees and costs. VLSI should be made whole for Defendants' abuses, which are tortious and a violation of Virginia law. In her decision to sanction PQA for its misconduct, the Director of the USPTO expressly found that she was not deciding whether VLSI suffered compensable injury from Defendants' abuse of process. That open question should now be decided.

## THE PARTIES

7.  Plaintiff VLSI is a Delaware limited liability company duly organized and existing under the laws of the State of Delaware. Its principal place of business is 150 South Wacker Drive, Suite 2400, Chicago, IL 60606.

8.  PQA is a limited liability company organized under the laws of South Dakota. The address of the registered office of PQA is Northwest Registered Agent, 25 First Avenue SW, Suite A, Watertown, SD 57021. The Name of PQA's registered agent is Northwest Registered Agent.

9.  Upon information and belief, Defendant Joseph Uradnik is an individual who is a citizen of Minnesota and is domiciled at 30177 Arrowhead Road, Grand Rapids, MN 55744. Uradnik testified that he was authorized by the undisclosed members of PQA to speak on PQA's behalf during IPR proceedings.

3

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over Defendants because Defendants transacted business in the Commonwealth and caused tortious injury to VLSI by acts and omissions in the Commonwealth, where Defendants filed petitions to initiate the IPR proceedings and then abused the PTAB's processes and procedures in prosecuting the petitions.

11.     Venue is proper in this Court because all or part of the cause of action arose in Alexandria, and evidence (including the IPR file) and witnesses to the action are in Alexandria.

## FACTUAL BACKGROUND

### I.     THE PTAB AND *INTER PARTES* REVIEW

12.     This case involves abuse of process before a tribunal within the USPTO called the PTAB, which is headquartered in Alexandria, Virginia.

13.     IPR proceedings are trial procedures that permit third parties to challenge the validity of patents issued by the USPTO. IPRs are intended to provide a quick and cost-effective alternative to patent infringement litigation, thus fostering a more efficient and streamlined patent system that ultimately will improve patent quality.

14.     In an IPR proceeding, the PTAB can only determine whether a certain invention is patentable. It has no authority to award a party challenging a patent damages or to compensate a petitioner for successfully invalidating a patent claim.

15.     The statute creating IPR provides that—with one critical exception—any person who is not the owner of a patent may file with the USPTO a petition to institute IPR proceedings with respect to the patent. According to that exception, an IPR may not be instituted if the petition requesting the IPR proceeding is filed more than one year after the petitioner, real party-in-interest, or privy of the petitioner is served with a complaint alleging patent infringement. Petitioners are

4

therefore required to identify all real parties in interest. If the petitioner identifies a real party-in-interest that is time-barred, the PTAB must deny the petition for IPR. An otherwise time-barred party may, however, join an already instituted IPR.

16.     If the PTAB invalidates a patent in an IPR proceeding after a jury awards damages to a patent owner in an infringement action, the infringer may seek to have the damages award vacated on the basis of the PTAB's finding of invalidity, provided that the underlying infringement action has not reached final non-appealable judgment.

17.     All documents filed with the PTAB must be signed under oath and with a representation that they are not being filed for an improper purpose.

18.     Bad faith actors have an incentive to abuse the IPR process and game the system by trying to extort millions of dollars out of patent owners who have successfully enforced their patent rights in court. Such actors may improperly seek to file IPR petitions in bad faith with the end goal of ultimately dismissing the petition before the PTAB institutes an IPR proceeding in exchange for a windfall from the patent owner's damages award.

19.     As described below, Defendants are such bad faith actors who engaged in a brazen abuse of the IPR process.

## II.     VLSI'S HISTORIC JURY VERDICT AGAINST INTEL FOR PATENT INFRINGEMENT

20.     On April 11, 2019, VLSI filed a patent infringement suit against Intel in the U.S. District Court for the Western District of Texas ("WDTX"). The complaint alleged that Intel infringed multiple semiconductor technology patents owned by VLSI, including U.S. Patent Nos. 7,523,373 (the "'373 Patent") and 7,725,759 (the "'759 Patent").

21.     After VLSI filed its complaint, in late 2019 and early 2020, Intel filed IPR petitions with the PTAB arguing that the '373 Patent and '759 Patent were invalid. The PTAB declined to

5

institute IPRs on the basis that the WDTX action (which included defenses similar to those posed by Intel in the proposed IPRs) was nearing trial and thus, any PTAB proceedings would be duplicative of the WDTX's assessment of validity.

22.     After Intel's IPR petitions were dismissed by the PTAB, a jury trial commenced on February 22, 2021 in the WDTX. On March 2, 2021, after a five-day trial, a jury returned a verdict in favor of VLSI. The jury specifically found that (a) all asserted claims of the '373 Patent were literally infringed by Intel and all asserted claims of the '759 Patent were infringed by Intel under the doctrine of equivalents; (b) no asserted claim of the '759 Patent was invalid; and (c) VLSI was entitled to $1.5 billion of lump sum damages for Intel's infringement of the '373 Patent and $675 million in lump sum damages for Intel's infringement of the '759 Patent.

23.     Following entry of the verdict, Intel moved for judgment as a matter of law and a new trial. The Court denied Intel's motion and, on April 21, 2022, entered final judgment, which included the following:

a. Intel was found to have infringed all claims at issue in the '373 and '759 Patents;

b. Judgment was entered against Intel on its counterclaims of noninfringement of the asserted claims of both the '373 and '759 Patents;

c. Judgment was entered against Intel on its counterclaims of invalidity of the '373 and '759 Patents;

d. The claims VLSI asserted on the '759 Patent were found to be not invalid;

e. The Court awarded $1.5 billion to VLSI for Intel's infringement of the '373 Patent claims and $675 million to VLSI for Intel's infringement of the '759 Patent claims; and

6

f. The Court additionally awarded VLSI prejudgment interest in the amount of $162,321,343.

24. After judgment was entered in the WDTX infringement action, Intel had no lawful ability to again petition the PTAB for an IPR with respect to the '373 and '759 Patents. As described above, no petition for an IPR may be filed more than one year after the date on which the petitioner, a real party-in-interest, or a privy of the petitioner is served with a complaint alleging infringement. Nor could a petition lawfully be filed by any petitioner if Intel was a real party-in-interest or in privity with the petitioner.

25. While Intel, its privies, and anyone representing Intel as the real party-in-interest were legally barred from initiating an IPR directed at either of the patents that it was found to have infringed, that bar did not categorically preclude an entity that was independent of Intel from challenging the validity of the patents in an IPR. Nor did it preclude Intel from joining an already-instituted IPR proceeding.

## III. PATENT QUALITY ASSURANCE IS SUDDENLY CREATED ON THE HEELS OF THE VERDICT

26. On or about June 14, 2021, approximately three months after the jury's almost $2.2 billion verdict against Intel, a mysterious entity called Patent Quality Assurance, LLC was formed in South Dakota. South Dakota law does not require an LLC formed there to identify its members.

27. PQA was formed upon the application of a company called Northwest Registered Agent, LLC, which offers registered agent services to those seeking to form businesses.

28. Northwest Registered Agent promotes itself as offering services that help mask the identities of those behind newly formed companies.

29.     In PQA's Articles of Organization filed with the South Dakota Secretary of State on or about June 14, 2021, Northwest Registered Agent identified "Morgan Noble" as the name of PQA's organizer.

30.     On information and belief, Morgan Noble is not a real person, but a fictitious identity used by Northwest Registered Agent around the country when forming entities for its clients. For example, Northwest Registered Agent used "Morgan Noble" when creating: a West Virginia entity called Center for Hope and Change LLC, a Delaware entity called Shao Partners LLC, a Massachusetts entity called Summit Statistics Solutions LLC, a Nevada entity called FLU LLC, and a Virginia entity called The PartyLady LLC.

31.     Many of the companies for which Northwest Registered Agent has used "Morgan Noble" as an organizer have been found to engage in wrongdoing, and/or do not operate as a legitimate company would. For example:

   a.  In March 2021, the Better Business Bureau issued a warning against TLS LLC after several individuals performed work for TLS but were never paid for their services.

   b.  Phoenix Solutions was allegedly used by former Speaker of the Tennessee House of Representatives, Glen Casada, to illegally launder campaign funds.

   c.  Tarantula Outlet LLC allegedly engaged in a scam involving exotic animals.

   d.  In December 2021, Hope and Change LLC had its business license revoked for failing to file an annual report with the West Virginia Secretary of State.

32.     PQA does not make, use, sell, or import any products, let alone any products that could subject it to claims of infringement of VLSI's patents. Rather, it was apparently created solely for the purpose of extorting VLSI by filing IPR petitions challenging the validity of its

8

patents before the PTAB and then offering to dismiss those petitions in exchange for exorbitant sums of money.

## IV. DEFENDANTS' IPR PETITON

33. On or around July 7, 2021, less than a month after its formation, PQA filed an IPR petition with the PTAB in Alexandria, Virginia challenging the validity of the '373 Patent claims that formed the basis of $1.5 billion of the $2.175 billion award against Intel.

34. In support of its IPR petition, PQA filed a sworn declaration of defendant Uradnik. Uradnik stated in his declaration that "[n]o business entity is a member of, owns any interest in, or exerts control over [PQA]." He further stated that "[e]ach member of [PQA] is a United States citizen who is not employed by, does not work for, and is not affiliated with" Intel or VLSI. While he stated in his declaration that PQA was "owned and managed exclusively by its members," he did not disclose who those members were.

35. PQA's petition was almost a verbatim copy of the IPR petition that Intel filed in 2019 challenging the '373 Patent, which the PTAB had declined to institute. Since PQA had no business aside from challenging VLSI's patents, and thus was not at risk of being sued for patent infringement, it disingenuously claimed that its sole purpose in seeking to invalidate the patent was "to instill confidence in the integrity of the patent system and to ensure that innovative U.S. companies (and their consumers) are not unfairly taxed by entities asserting invalid patents."

36. Defendants' subsequent bad faith actions in prosecuting the IPR proceeding demonstrated that their true motive had nothing to do with the integrity of the patent system.

## V. DEFENDANTS' FALSE AND EVASIVE FILINGS WITH THE PTAB AND ATTEMPTS TO EXTORT VLSI

37. PQA's IPR petition was not the first to challenge the validity of the '373 Patent following the WDTX verdict. An earlier petition was filed by an entity called OpenSky Industries,

9

LLC ("OpenSky"), which similarly copied the invalidity arguments raised in Intel's failed 2019 petition. The USPTO Director ultimately sanctioned OpenSky for filing abusive IPR petitions.

38.     Defendants recognized that OpenSky's nearly identical challenge to VLSI's patent was a major obstacle to the success of their extortionate scheme. If IPR proceedings were instituted based on OpenSky's petition, it would make little sense for VLSI to pay a large settlement to PQA, because VLSI would be required to defend the validity of its patent regardless of whether PQA voluntarily dismissed its petition. Additionally, it is likely that the PTAB would have dismissed PQA's petition as duplicative if it instituted review based on OpenSky's petition. Thus, before trying to extract a large settlement from VLSI, Defendants knew that they needed to eliminate OpenSky's competing petition.

39.     Defendants misled the PTAB to get it to dismiss OpenSky's IPR petition. OpenSky attached to its petition a declaration from a technical expert, Dr. Adit Singh. This declaration had been prepared for Intel and filed with its failed 2019 IPR. OpenSky filed Dr. Singh's declaration without his knowledge and without retaining him.

40.     Four days after OpenSky filed its IPR petition, an unnamed "Petitioner" (who was in fact the people who would go on to form PQA) retained Dr. Singh. By the time PQA was created and filed its IPR petition, it argued that it had "exclusively" engaged Dr. Singh, and that its petition should therefore be granted in favor of OpenSky's earlier-filed petition because OpenSky could not present Dr. Singh for cross-examination. Based on PQA's representation about its exclusive retention of Dr. Singh, the PTAB found that OpenSky "brought forth the testimony of an expert that [OpenSky] likely cannot produce for cross-examination and will likely be excluded" as hearsay. Accordingly, on December 23, 2021, the PTAB concluded that OpenSky's '373 petition

10

did not warrant institution based on PQA's representation that OpenSky would have been unable to engage Dr. Singh. With that, the obstacle to Defendants' extortionate plan was removed.

41.     As USPTO Director Kathi Vidal later found, PQA's representation about its "exclusive" arrangement with Dr. Singh was false. In a December 2022 decision, Director Vidal "determin[ed] that PQA, through its counsel, abused the IPR process by advancing a misleading argument and a misrepresentation of fact by representing, in its Petition, that it had exclusively engaged Dr. Singh, a witness relied on by another party . . . OpenSky . . . in a parallel proceeding, and which representation it later qualified as *not* being an exclusive engagement."

42.     In addition to finding that PQA's representation about the nature of its relationship with Dr. Singh was false, USPTO Director Vidal found that PQA's behavior was inconsistent with its representations that it was challenging the '373 Patent to protect the integrity of the patent system. The Director found that PQA's behavior instead "show[ed] an intent to ensure that PQA, not OpenSky, would benefit monetarily from any [settlement] arrangement with VLSI." After all, if PQA's real motive for filing its petition was to protect the quality of the patent system, it would not care whether its petition or OpenSky's petition was the vehicle for invalidating the '373 Patent, and it would have made Dr. Singh available to OpenSky to challenge the patent. On the other hand, Defendants could extract a large settlement from VLSI only if OpenSky's petition was dismissed.

43.     On or around July 7, 2021, at the time Defendants filed their IPR petition with the PTAB, PQA served the same petition containing its representations about its exclusive relationship with Dr. Singh on counsel of record for VLSI.

44.     Had VLSI been aware of the true nature of PQA's relationship with Dr. Singh at the time PQA had filed its petition, it would have made that fact known to the PTAB.

45. After OpenSky's IPR petition was dismissed, Defendants saw that the time was right to demand an extortive settlement from VLSI. Understanding that PQA had no actual interest in challenging the '373 Patent, VLSI had earlier tried to engage in settlement discussions with PQA—efforts that PQA initially rebuffed. But after OpenSky's competing petition was dismissed, PQA communicated to VLSI that it was willing to dismiss its own IPR petition, and give up its purported mission to protect the integrity of the patent system, in exchange for exorbitant amounts of money.

46. PQA further threatened that, if VLSI didn't pay off PQA, it would file a motion to join the Opensky IPR seeking to invalidate the other patent underlying the verdict against Intel—the '759 Patent. Defendants followed through on their threat. Once Defendants realized that VLSI would not cave to their demand, PQA petitioned to join OpenSky's IPR seeking to invalidate the '759 Patent. Defendants' conduct caused VLSI to expend attorneys' fees on briefing to oppose PQA's joinder petition. PQA then voluntarily withdrew its retaliatory petition just two days before the PTAB's deadline for a decision on whether to grant the joinder request.

47. When it filed the IPR petition to join OpenSky's IPR challenging the '759 Patent, PQA once again represented to the PTAB that its purpose in doing so was to protect the integrity of the patent system—a motive that is belied by the fact that it threatened to file the petition only if VLSI did not agree to pay it to go away. Defendants thus used the legal process of the PTAB and the risk of an impending IPR institution decision as a threat to further their scheme to extort large sums of money from VLSI.

48. PQA's behavior during settlement discussions also demonstrated an intent to extort VLSI in the future. For example, PQA refused to bind its principals to any settlement or even identify to VLSI who its principals were. Without knowing who was behind PQA's creation, VLSI

would not have any assurances that the same principals would forego attempts to create a different entity and petition the PTAB for an IPR seeking to invalidate VLSI's patents in the future (perhaps even the next day).

49.     On January 26, 2022, over VLSI's objections, the PTAB instituted PQA's IPR seeking to invalidate the '373 patent. That same day, Intel sought to join the IPR proceeding that was instituted based on PQA's petition. The PTAB granted Intel's joinder request.

## VI.     DEFENDANTS ABUSE THE DISCOVERY PROCESS DURING THE IPR

50.     After the PTAB instituted the IPR based on PQA's petition, VLSI was entitled to take discovery of PQA's purported spokesperson Joseph Uradnik, who had filed the declaration in support of PQA's petition. During his deposition, VLSI's counsel sought to learn basic facts about PQA's formation, its membership, and its reasons for challenging VLSI's patent. Such discovery was relevant and important because, if PQA's purpose for filing its IPR petition was to extort a payment, VLSI could have sought to have the proceedings dismissed as a sanction for PQA's abuse of the IPR process. Additionally, if it turned out that Intel and PQA had coordinated their petitions to circumvent the time bar on Intel's petition, Intel also could have been dismissed from the proceedings or the IPR could have been de-instituted.

51.     Defendant Uradnik was deposed on May 5, 2022. Instead of answering VLSI's legitimate deposition questions about the nature and purpose of PQA and its membership, Uradnik stonewalled, claiming that PQA had not authorized him to answer any deposition question or to provide VLSI with any information whatsoever aside from the very limited representations he had made in his declaration accompanying PQA's IPR petition. Thus, Defendants willfully violated the rules governing depositions and the PTAB's discovery process and procedures.

52.     For example, during the deposition, counsel for VLSI asked Uradnik to identify the members of PQA. Uradnik refused to answer the question and instead responded that he was "not authorized to speak on that topic." Mr. Uradnik similarly refused to identify how many members of PQA existed and whether he himself was a member of PQA.

53.     VLSI's counsel also asked Uradnik to identify the persons who had a financial interest in PQA and whether Uradnik himself had a financial interest in PQA. Uradnik once again refused to answer the question and responded that he was "not authorized to speak" on that topic.

54.     Similarly, VLSI's counsel asked Uradnik various questions to determine the motive underlying PQA's formation. Such questions included whether PQA was formed to extort money from VLSI and whether PQA was legitimately concerned about the integrity of the U.S. patent system. Again, Uradnik refused to answer VLSI's counsel's questions and instead stated that he was not authorized to speak on those topics.

55.     VLSI's counsel also asked Uradnik whether PQA had coordinated with or communicated with Intel in any way prior to filing its IPR petition seeking to invalidate the '373 Patent. Uradnik once again refused to answer the question and stated that he was not authorized to speak on that topic.

## VII.   DEFENDANTS INTENTIONALLY USE THE IPR PROCESS TO DRIVE UP VLSI'S ATTORNEYS' FEES AND COSTS

56.     After the PTAB instituted IPR and joined Intel as a party, PQA's active participation in the proceedings was no longer necessary. Yet, even though PQA could not receive any benefit from the continued prosecution of its IPR petition—after all, the PTAB could not award it any compensation and it faced no risk of being sued by VLSI for patent infringement if the patent was found to be valid—after the PTAB instituted review, Defendants continued to use the PTAB's discovery process to increase VLSI's costs of litigating their abusive IPR.

57.     For example, PQA deposed VLSI's expert. PQA also sought for the USPTO to exercise its power to conduct an *in camera* inspection of documents VLSI logged as privileged in response to discovery mandated by the USPTO Director and filed a frivolous motion to expunge certain documents from the record. Moreover, after the USPTO Director found that PQA abused the IPR process, PQA filed a frivolous mandamus petition with the Federal Circuit challenging that decision, which it later voluntarily withdrew.

58.     PQA also asked the PTAB to exercise its power to provide joined petitioner Intel with access to sealed material in the record. As described above, if it was not for PQA's extortive petition, Intel would have been time-barred from filing a petition on its own and thus barred from accessing the sealed material.

59.     In this and other ways, Defendants misused the processes and procedures of the IPR proceeding, which were enforceable by the PTAB and USPTO Director, for the improper purpose of increasing VLSI's costs of litigating the IPR after VLSI refused to yield to PQA's extortive settlement demands. Rather than promote the efficiency of the patent process, which was the intended purpose of the PTAB and IPR procedures, Defendants used those procedures as tools for harassment.

## VIII. THE USPTO DIRECTOR REVIEWS PQA'S CONDUCT IN THE IPR PROCEEDINGS FOR ABUSE OF PROCESS

60.     On or around April 27, 2022, U.S. Senators Mazie Hirono and Thom Tillis sent a letter to USPTO Director Vidal expressing concern that PQA and OpenSky were abusing the IPR process by filing petitions seeking to invalidate the '373 and '759 patents in an apparent attempt to extort money from VLSI. The Senators explained that the IPR petitions were suspect from the outset based on the facts that (a) the entities were formed shortly before filing their petitions; (b) the entities did not make, use, sell, or import *any* products, let alone any products that could subject

15

them to claims of infringement; (c) the companies filed their petitions only after VLSI had secured a nearly $2.2 billion infringement verdict against Intel; and (d) the petitions filed by PQA and OpenSky were near carbon copies of petitions previously filed by Intel that had been rejected by the USPTO. The Senators concluded that PQA and OpenSky's "activities represent a clear abuse of the IPR system."

61.     On June 7, 2022, USPTO Director Vidal initiated Director review of the PTAB's decision to institute PQA's IPR. Citing the same concerns articulated by Senators Hirono and Tillis in their letter to her, Director Vidal ordered that the parties to the IPR file briefing to, *inter alia*, answer the following interrogatory questions:

> a. When was PQA formed? For what purpose? What is the business of PQA? Who are members of PQA? Which other persons or entities have an interest in PQA or any of its activities including [the IPR] proceeding?
>
> b. What is the relationship between PQA and each of the other parties [*i.e.*, VLSI and Intel]? Other than communications already in the record, what communications have taken place between PQA and each of the other parties?
>
> c. Could PQA be subject to claims of infringement of the '373 patent? Does PQA have development plans to create a product that could arguably infringe the '373 patent? Does PQA have a policy reason for filing the Petition that benefits the public at large beside any reasons articulated in the already-filed papers?
>
> d. Does the evidence in this proceeding demonstrate an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the [statute creating IPR proceedings] and, if so, which evidence and how should that evidence be weighted and addressed?

e. What is the basis for concluding that there are no other real parties in interest, beyond PQA? Are there additional people or entities that should be considered as potential real parties in interest?

f. Did PQA ever condition any action relating to this proceeding, including but not limited to delaying, losing, not participating in, withdrawing from, or taking action that will influence any experts' participation in this proceeding, on payment or other consideration by Patent Owner or anyone else?

62. Additionally, Director Vidal ordered PQA to provide the following documents to VLSI:

i. all documents filed with state, federal, and/or other governmental regulatory entities related to the formation of PQA and any communications related to the same or to the formation of PQA;

ii. all documents relating to PQA's business plan including its funding, its potential revenue, and the future allocation of any of its profits;

iii. all documents and communications relating to the filing, settlement, or potential termination of this proceeding, or experts in this proceeding, not already of record in the proceeding;

iv. all documents and communications relating to the filing, settlement, or termination of any other *inter partes* review proceeding concerning the '373 patent, not already of record in this proceeding;

v. all documents and communications with Dr. Adit Singh relating to his retention by PQA, including any agreements with him;

vi. all documents and communications relating to any real party in interest and decisions made to list or not list any person or entity as a real party in interest; and

vii. all communications with any named party related to the filing, settlement, or potential termination of this proceeding.

63.     PQA refused to comply, agreeing to provide only "third party" communications among PQA and OpenSky, VLSI, Intel, governmental entities, and Dr. Singh, but not any internal PQA communications, contrary to Director Vidal's mandated discovery order. PQA's response to Director Vidal's discovery order further suggested that it did not intend to log communications that it intended to withhold under a claim of privilege.

64.     PQA's representations that it would flout Director Vidal's July 20, 2022 discovery order prompted her to issue another order reaffirming that PQA was required to comply with the full scope of the mandated discovery. She also reiterated that "[n]o responsive document may be withheld without being included in a . . . privilege log."

65.     Despite Director Vidal's clear instructions, Defendants willfully violated her discovery orders. They failed to produce any responsive internal PQA documents and produced only a limited work product redaction log of communications between PQA's counsel and Dr. Singh. PQA's log did not identify any communications between PQA and its counsel that were withheld on the grounds of attorney-client privilege. As a result of Defendants' failure to produce any internal documents or a meaningful privilege log, VLSI could not identify with specificity any documents for Director Vidal's *in camera* review.

66.     In addition to their brazen violation of Director Vidal's mandated discovery order, Defendants also willfully evaded her interrogatories, which required PQA to respond with citations to supporting documentary evidence.

67. For example, Director Vidal ordered PQA to disclose the purpose for which it was formed, what its business was, and who its members were. To answer these questions, PQA was required to produce materials including communications related to its formation and internal documents related to its business plan. Instead, PQA responded only that the "initial authorization of PQA is to challenge patent(s) to ensure patent quality." PQA refused to disclose its members, stating only that "PQA's members are United States citizens, none of whom are employed by, work for, or are affiliated with Intel, OpenSky, or VLSI." PQA also stated that "[n]o other persons or entities beyond PQA's members have an interest in PQA, its future revenues, profits, or obligations, or any of its activities including this proceeding."

68. Director Vidal found PQA's answers to the above interrogatory questions to be unresponsive, as they "only make[] assertion[s] as to who [PQA's] members are not; [they] do[] not identify the members of PQA." Additionally, Director Vidal found that PQA did "not answer the interrogatory seeking the purpose for which PQA was formed, nor [did] PQA provide any required supporting evidence that would allow" her or VLSI "to verify that PQA's business interest is limited to ensuring patent quality." Director Vidal similarly found PQA's other interrogatory responses to be insufficient.

## IX. DIRECTOR VIDAL FINDS THAT PQA ABUSED THE IPR PROCESS BUT PERMITS THE PROCEEDING TO CONTINUE

69. On December 12, 2022, Director Vidal issued a decision finding that PQA abused the IPR process. She "determin[ed] that PQA, through its counsel, abused the IPR process by advancing a misleading argument and a misrepresentation of fact by representing, in its Petition, that it had exclusively engaged Dr. Singh, a witness relied on by another party . . . OpenSky . . . in a parallel proceeding, and which representation it later qualified as *not* being an exclusive engagement." In addition, Director Vidal determined that "PQA abused the IPR process by filing

19

this IPR, and threatening to file another IPR petition seeking to join a related, instituted IPR by OpenSky, in an attempt to extract payment from VLSI." Moreover, Director Vidal concluded that PQA engaged in discovery misconduct by failing to comply with her mandated discovery order and inadequately responding to her interrogatories.

70.     For abusing the IPR process and engaging in discovery misconduct, Director Vidal dismissed PQA from the IPR. However, over VLSI's objection, Director Vidal refused to terminate the IPR proceeding and permitted it to move forward with Intel (who would have been time-barred from filing its own IPR) as the sole petitioner. Director Vidal reached this conclusion despite the fact that Intel indisputably would have been time-barred if it had initiated the IPR on its own. However, because it joined PQA's IPR after the PTAB instituted proceedings, the time bar did not apply. Thus, because of Defendants' abusive IPR petition and tactics during the proceedings, Intel was able to prosecute an IPR proceeding that it would otherwise have been foreclosed from pursuing.

71.     On January 27, 2023, Director Vidal restored PQA as a petitioner in the IPR solely for the purpose of retaining jurisdiction over PQA so that it could respond to an order to show cause for why it should not be further sanctioned.

## X.     THE USPTO DIRECTOR SANCTIONS PQA FOR ITS MISCONDUCT, BUT DOES NOT AWARD VLSI FEES, AND SPECIFICALLY NOTES THAT WHETHER VLSI SUFFERED COMPENSABLE INJURY IS AN OPEN QUESTION

72.     On June 13, 2023, the PTAB issued a final written decision on the challenged claims of the '373 Patent and found all of the claims to be unpatentable. In other words, the PTAB effectively found the '373 Patent, which was a basis for the jury's verdict against Intel in WDTX, invalid.

73. On August 8, 2023, on PQA's motion for reconsideration of her December 2022 decision that PQA had abused the IPR process, Director Vidal issued another decision finding that PQA had misrepresented the nature of its retention of Dr. Singh and determining that PQA had engaged in discovery misconduct. Once again, she concluded that PQA's conduct was sanctionable and issued another order to show cause for why PQA should not be required to pay VLSI's attorneys' fees.

74. On December 13, 2023, Director Vidal issued a decision sanctioning PQA for its misconduct, despite the fact that she affirmed the PTAB's decision to ultimately invalidate VLSI's patent. Although Director Vidal issued a "strong admonishment to PQA for its conduct," she declined to impose monetary sanctions on PQA. In her sanctions decision, Director Vidal explicitly stated that she was not deciding whether VLSI "suffered . . . compensable injury stemming from PQA's alleged misconduct."

75. To date, VLSI has not been compensated for the injuries it suffered as a result of PQA's abuse of the IPR proceeding and its processes and procedures—including the attorneys' fees and costs VLSI incurred.

## COUNT ONE
## ABUSE OF PROCESS
### (AGAINST ALL DEFENDANTS)

76. Plaintiff incorporates by reference and realleges paragraphs 1 through 75 set forth above.

77. Defendants had an ulterior purpose in using the processes and procedures of the IPR proceeding. Rather than genuinely seeking a determination on the patentability of the '373 Patent and '759 Patent—which Defendants had no interest in—their purpose was to harass VLSI,

21

run up its costs, and extort money from VLSI by offering to stop the challenge to the patents underlying its jury award if VLSI would just pay it to stop.

78.     Defendants' acts in the use of the processes and procedures were not proper in the regular course of the IPR proceedings, which included: repeatedly evading discovery and violating discovery rules; brazenly violating discovery orders; filing pleadings containing misrepresentations, including about who founded PQA and for what purpose, and PQA's relationship with its expert; serving unwarranted and harassing discovery on VLSI; and forcing VLSI to defend against frivolous motions.

79.     As a direct and proximate result of Defendants' abuse of process, VLSI has suffered damages in the amount of not less than \$3.2 million, which includes the attorneys' fees and costs VLSI incurred in defending against the IPR proceeding and Defendants' abusive tactics.

80.     Defendants' abuse of process was willful, malicious, wanton, oppressive, done with conscious indifference to the consequences, and with specific intent to harm. Therefore, VLSI is entitled to an award of punitive damages from Defendants, and each of them, in an amount to be proven at trial and sufficient to punish, penalize, and deter Defendants from engaging in such conduct in the future.

## COUNT TWO
## COMMON LAW FRAUD
## (AGAINST ALL DEFENDANTS)

81.     VLSI incorporates by reference and realleges paragraphs 1 through 80 set forth above. Beginning on or around June 7, 2021, at the time Defendants filed PQA's IPR challenging the validity of the '373 Patent, they intentionally and falsely represented to VLSI and the PTAB that, among other things, PQA exclusively retained Dr. Singh and PQA's purpose in petitioning for and pursuing IPR proceedings was "to instill confidence in the integrity of the patent system

and to ensure that innovative U.S. companies (and their consumers) are not unfairly taxed by entities asserting invalid patents." As the USPTO Director later found, these representations were false or misleading.

82.   These false representations were of material facts. As the USPTO Director acknowledged, the PTAB denied OpenSky's competing IPR petition based on PQA's representations about its exclusive relationship with Dr. Singh. If it were not for Defendants' false representation, the PTAB would have dismissed PQA's petition as duplicative of OpenSky's. Additionally, the PTAB would not have instituted IPR based on PQA's petition if PQA had been honest that its motive for filing the petition was to extort VLSI.

83.   Defendants' false representations were made intentionally and knowingly, with the intent to mislead both VLSI and the PTAB.

84.   VLSI relied on Defendants' false representations, resulting in damages to VLSI. Had VLSI known the true nature of PQA's relationship with Dr. Singh or PQA's true purpose in pursuing IPR, VLSI would have brought it to the PTAB's attention, which would have resulted in the dismissal of PQA's petition, and saved VLSI millions of dollars in attorneys' fees and costs incurred to defend against the IPR.

85.   Importantly, PQA did not make its settlement demands known until on or around December 31, 2021—which was after it had eliminated OpenSky's competing petition and after the final briefing deadline to the PTAB related to institution of the IPR petition had passed. Had VLSI been aware that PQA intended to extort it sooner, it could have raised this issue with the PTAB before IPR proceedings had been instituted. PQA's misrepresentations about its true motives for filing an IPR petition were thus material, and VLSI relied on these misrepresentations to its detriment.

86. As a direct and proximate consequence of PQA's fraud, VLSI suffered damages, including $3.2 million that it incurred in attorneys' fees and costs to defend against PQA's instituted IPR that VLSI would have avoided absent Defendants' fraud.

87. Defendants' fraud was willful, malicious, wanton, oppressive, done with conscious indifference to the consequences, and with specific intent to harm. Therefore, VLSI is entitled to an award of punitive damages from Defendants, and each of them, in an amount to be proven at trial and sufficient to punish, penalize, and deter Defendants from engaging in such conduct in the future.

## COUNT THREE
## STATUTORY BUSINESS CONSPIRACY
## (AGAINST ALL DEFENDANTS)

88. VLSI incorporates by reference and realleges paragraphs 1 through 87 set forth above.

89. In violation of Va. Code §§ 18.2-499-501, PQA, Uradnik, and others combined, associated, agreed, mutually undertook, or concerted together for the purpose of willfully and maliciously injuring VLSI in its reputation, trade, business or profession.

90. Among other things, Defendants agreed and combined to injure VLSI's business and reputation by abusing the processes and procedures of the IPR proceeding in violation of Virginia law and defrauding VLSI.

91. As a direct and proximate result of Defendants' unlawful conspiracy, VLSI has suffered substantial monetary damages in an amount not less than $3.2 million, said damages to be proven at the time of trial.

92. VLSI is entitled to an award of treble damages for Defendants' violations.

93.    VLSI is also entitled to an award of the costs of suit, including reasonable attorneys' fees and expenses, and any injunction the Court deems reasonable.

## COUNT FOUR
## COMMON LAW CONSPIRACY
## (AGAINST ALL DEFENDANTS)

94.    VLSI incorporates by reference and realleges the allegations in paragraphs 1 through 93 set forth above. PQA, Uradnik, and others combined to accomplish, by some concerted action, some criminal or unlawful purpose, or some lawful purpose by criminal or unlawful means. Among other things, they combined to injure VLSI and extort money from VLSI by abusing the processes and procedures of the IPR proceedings in violation of Virginia law and defrauding VLSI.

95.    As a result of Defendants' unlawful conspiracy, VLSI has suffered substantial monetary damages in an in an amount not less than $3.2 million, said damages to be proven at the time of trial.

96.    Defendants' conspiratorial conduct was willful, malicious, wanton, oppressive, done with conscious indifference to the consequences, and with specific intent to harm. Therefore, VLSI is entitled to punitive damages sufficient to punish, penalize, and deter Defendants from engaging in such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    Enter judgment in favor of VLSI on all counts;

2.    Award VLSI compensatory damages against Defendants in the amount VLSI proves at trial, not less than $3.2 million;

3.    Award VSLI punitive damages against Defendants to the maximum amount allowed by law;

4.    Award VLSI treble its compensatory damages against Defendants;

5.    Award VLSI its costs, including reasonable attorneys' fees and expenses, incurred

in connection with this action; and

6.    Grant such other relief as the case may require or as may be deemed proper and

equitable.

Dated: January 31, 2024                    Respectfully submitted,

Ellen D. Marcus (Virginia Bar No. 44314)
HOLMES COSTIN & MARCUS PLLC
908 King Street, Suite 330
Alexandria, Virginia 22314
(703) 991-7951
emarcus@hcmlawva.com

Michael S. Schachter (*pro hac vice* application
forthcoming)
Steven J. Ballew (*pro hac vice* application
forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019
(212) 728-8000
mschachter@willkie.com
sballew@willkie.com

Joshua L. Solomon (*pro hac vice* application
forthcoming)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, Massachusetts 02116
jsolomon@pdsfirm.com
(617) 960-0556

*Counsel to Plaintiff VLSI Technology LLC*

26

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA

VLSI TECHNOLOGY LLC,

    Plaintiff,

v.

    Civil Action No. CL 24001093

PATENT QUALITY ASSURANCE, LLC and
JOSEPH URADNIK,

    Defendants.

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT PATENT QUALITY ASSURANCE, LLC

COMES NOW the plaintiff, VLSI Technology LLC, by counsel, and pursuant to Rule 4:8

of the Supreme Court of Virginia, requesting that the defendant, Patent Quality Assurance LLC,

answer this First Set of Interrogatories (the "Interrogatories") within twenty-eight (28) days of the

date of service hereof. Each Interrogatory shall be answered fully, in writing, under oath, and in

accordance with the following Definitions and Instructions.

If you fail to answer any of these Interrogatories, or if your responses are otherwise

insufficient, VLSI may move for an Order to Compel which, if granted by the Court with a finding

that your refusal or failure to sufficiently answer was without substantial justification, may require

you, your attorney, or both, to pay the expenses that VLSI reasonably incurred in obtaining the

Order to Compel, including but not limited to its reasonable attorney's fees.

## DEFINITIONS AND INSTRUCTIONS

A.    The terms "**PQA**," "**you**," and "**your**" mean the defendant Patent Quality

Assurance, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants,

contractors, employees, managers, members, officers, representatives, and any other person or

entity under PQA's direction or control.

B. The terms **"plaintiff"** and **"VLSI"** mean VLSI Technology LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, members, managers, officers, representatives, and any other person or entity under VLSI's direction or control.

C. The term **"Uradnik"** means the defendant Joseph Uradnik, as well as his accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, representatives, and any other person or entity under Uradnik's direction or control.

D. The term **"Intel"** means Intel Corporation, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, directors, employees, officers, representatives, and any other person or entity under Intel's direction or control.

E. The term **"Northwest Registered Agent"** means Northwest Registered Agent, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under Northwest Registered Agent's direction or control.

F. The term **"OpenSky"** means OpenSky Industries, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under OpenSky's direction or control.

G. The term **"communication"** means any disclosure, transfer or exchange of information or opinion, however made.

H. The term **"document"** means any handwritten, recorded, graphic, photographic, printed, typed or otherwise transcribed matter, whether on paper, tape, cards, disks, drives, charts, cloud storage, film, magnetic storage, or any other medium or detection device. By way of

illustration, and in no way limiting the scope of the term, "**document**" includes all written communications, agreements, calendars and planners (electronic or hard copy), bills, bulletins, books, bookkeeping entries, charts, checks, code, contracts, data compilations, data sheets, demands, diaries, directives, direct messages, disks, drafts, drawings, drives, e-mails, electronic files, expense reimbursement statements, financial journals, financial statements, instant messages, ledgers, letters, literature, log books, logs, notebooks, notes, notices, photographs, presentations (including PowerPoint presentations), printouts, receipts, recordings, records, reports, research, screenshots, slide decks, slideshows, social media posts, speeches, spreadsheets, software, statements, statistics, telegrams, text messages, transcriptions, videos, word processing documents, work assignments and work sheets, whether prepared by you or on your behalf for your own use or for transmittal, or received by you, and wherever located. The word "**document**" also includes all copies unless such copies (including any marks thereon) are exact duplicates of documents that are produced.

    I.      The terms "**refer**" and "**relate**," as to any given subject, mean anything that constitutes, contains, embodies, reflects, identifies, states, deals with, or is in any manner whatsoever pertinent to the subject, including, but not limited to, documents concerning the preparation of any documents.

    J.      The term "**agreement**" means a contract, arrangement or understanding, formal or informal, oral or written, between two or more persons.

    K.      The term "**person**" means any natural person, corporation, company, partnership, joint venture, firm, association, or any other business or legal entity, whether private or governmental.

    L.      The terms "**identify**" and "**describe**":

1. As applied to an individual, mean to give his or her name, last known address, and employer;

2. As applied to an entity other than an individual, mean to give the legal name and trade name of the entity, the nature of the entity (corporation, partnership, limited liability company, trust, etc.), and the full address of its principal place of business;

3. As applied to a document, mean to give its date, its author(s), its recipient(s) (including "cc:" and "bcc:" recipients), its nature (*e.g.*, contract, note, check, letter), its control number (if any), its last known location, and its present custodian;

4. As applied to a conversation, statement, admission, negotiation, or oral communication, mean to give the substance of the conversation, statement, admission, negotiation, or oral communication, the time, date, and place of the conversation, statement, admission, negotiation, or oral communication, to identify the speaker or author, to identify any individuals present, and to identify any documents reflecting, summarizing, or relating to the conversation, statement, admission, negotiation, or oral communication;

5. As applied to a transaction, mean to give the date of the transaction, to identify the parties to the transaction, to identify the nature of the transaction, to state its purported and actual purpose, to state the amount of the transaction, and to identify all documents that summarize, reflect, or constitute the transaction;

6. As applied to an act or action, mean to state what occurred, the time, date, and place at which it occurred, to identify the individual or entity taking the action, and to identify all individuals present or otherwise observing the act or action;

7. As applied to a contract or agreement, mean to identify all documents constituting the contract or agreement, including without limitation any attachments, exhibits, and any other documents or information referenced therein whether expressly incorporated therein or not; all parties to the contract or agreement or any persons involved in solicitation of information relating thereto or the negotiation thereof; the date of the contract or agreement; and all terms and conditions of the contract, lease, or agreement not set forth in identified documents

8. As applied to an occasion, mean to identify the time, date, place, and surrounding circumstances attendant thereto, as well as all individuals or entities present and the substance of their participation or role with respect thereto.

M.     Unless otherwise defined in these Interrogatories, terms and acronyms have the same

meaning as they do in that pleading.

4

N.    Each use of the singular form herein shall be deemed to include the plural form and vice versa. Use of the word "or" includes the word "and," and vice versa.

O.    Your answers to these Interrogatories should be to the best of your knowledge, recollection, and belief. Such knowledge includes the knowledge of your accountants, agents, assigns, attorneys, consultants, contractors, directors, employees, managers, members, officers, representatives, and any other person or entity under your control.

P.    Where any answer is based on information other than your personal knowledge, specify the source and basis of all facts and information contained in the answer.

Q.    All objections as to any claim of work product or privilege of any kind shall:

   1.  Specifically state the nature of the claim of work product or privilege;

   2.  State the facts relied upon in support of the claim of work product or privilege;

   3.  Identify any documents relating to the claim of work product or privilege; and

   4.  Identify all persons having knowledge of any facts related to the claim of work product or privilege.

R.    These Interrogatories are continuing in nature. You shall provide supplemental answers should you obtain or discover information which will augment or otherwise modify your answers in response to these Interrogatories, and shall do so promptly, but in any event prior to the date of trial.

S.    Unless otherwise indicated below, the relevant time period for these Interrogatories is from March 2, 2021 through the present.

## INTERROGATORIES

1.    Identify all persons with personal knowledge of any of the facts and allegations contained in the Complaint in this action. For each person identified, briefly describe the information known by such person, as well as an address where the person may be served with a

5

deposition or document subpoena, and a telephone number and email address where the person can be reached.

2.      Identify all of PQA's members, managers, officers, employees and contractors. For all of PQA's members that are limited liability companies, limited partnerships, or partnerships, identify all members, managers, officers, directors or partners of each of those entities. For all of those entities, identify all members, officers, directors or partners of those entities, and so on, until you identify the ultimate member, manager, or partner that is an individual or corporation.

3.      Identify every investment, loan, capital contribution, donation, or other monetary contribution of any kind provided to or used by PQA to fund PQA's formation and operation, including each person who contributed to PQA's financing and the amount of money contributed. For any such persons identified who are limited liability companies, limited partnerships, or partnerships, identify all members or partners for all layers of those entities, such that you identify the ultimate member, manager, or partner that is an individual or corporation.

4.      Identify all persons involved in communications relating to the formation of PQA.

5.      Identify all natural persons involved in the operation of PQA, and for each, state their title with PQA if they have one, and describe in detail their relationship to PQA, responsibility and authority within PQA, and compensation arrangement with PQA.

6.      Describe in detail all communications you have had with Intel relating to any of VLSI's patents, including but not limited to U.S. Patent No. 7,523,373 (the "'373 Patent") or U.S. Patent No. 7,725,759 (the "'759 Patent"), and include in your description when, where, and how each communication occurred, what was said and by whom, and the identity of all persons present.

7.      Describe in detail all communications you have had with OpenSky relating to any of VLSI's patents, including but not limited to the '373 Patent and the '759 Patent, and include in

6

your description when, where, and how each communication occurred, what was said and by whom, and the identity of all persons present.

8.      Describe in detail PQA's mission and business plan, including its goals and its plans to achieve them.

9.      Describe in detail the day-to-day business of PQA, where it is conducted, and the natural persons who conduct that business on PQA's behalf.

10.     Describe in detail all communications you have had with any person about preserving the integrity of the U.S. patent system, and include in your description when, where, and how each communication occurred, what was said by whom, and the identity of all persons present.

11.     Identify all persons who participated in communications relating to settlement discussions between PQA and VLSI, and describe in detail all such communications. Include in your description when, where, and how each communication occurred, what was said and by whom, and the identities of each person present.

12.     Identify all persons involved in the retention of Dr. Adit Singh in connection with PQA's IPR challenging the '373 Patent, and describe in detail all such communication. Include in your description when, where, and how each communication occurred, what was said and by whom, and the identity of all persons present.

13.     Identify all persons who communicated about PQA's formation and the retention of Northwest Registered Agent to file Articles of Organization for PQA, including but not limited to persons associated with PQA and Northwest Registered Agent involved in such communications, and describe in detail all communications relating to Northwest Registered Agent and the formation of PQA. Include in your description when, where, and how each

7

communication occurred, what was said and by whom, and the identities of each person present.

14.     Describe in detail PQA's relationship with Morgan Noble, including how he came to be identified as PQA's organizer, any compensation arrangements he has ever had with PQA or with anyone else in exchange for his services for PQA, any membership or ownership interest he has in PQA, and how he can be contacted.

15.     Identify all persons who communicated with Morgan Noble, have had any contact with Morgan Noble, have information concerning Morgan Noble's role as PQA's organizer, or possess contact information for Morgan Noble.

16.     Identify all persons involved in the drafting and review of all pleadings, papers, petitions, exhibits, declarations, motions, and any other documents PQA filed in connection with IPRs challenging VLSI's patents.

February 5, 2024

*Eh D. V*

Ellen D. Marcus (Virginia Bar No. 44314)
HOLMES COSTIN & MARCUS PLLC
908 King Street, Suite 330
Alexandria, Virginia 22314
(703) 991-7951
emarcus@hcmlawva.com

Michael S. Schachter (*pro hac vice* application
forthcoming)
Steven J. Ballew (*pro hac vice* application
forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019
(212) 728-8000
mschachter@willkie.com
sballew@willkie.com

Joshua L. Solomon (*pro hac vice* application
forthcoming)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, Massachusetts 02116
jsolomon@pdsfirm.com
(617) 960-0556

*Counsel to Plaintiff VLSI Technology LLC*

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA

| |
|---|
| VLSI TECHNOLOGY LLC, |
| Plaintiff, |
| v. |
| PATENT QUALITY ASSURANCE, LLC and JOSEPH URADNIK, |
| Defendants. |

Civil Action No. CL 24001093

## PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS
## TO DEFENDANT PATENT QUALITY ASSURANCE, LLC

COMES NOW the plaintiff, VLSI Technology LLC, by counsel, and pursuant to Rule 4:11

of the Supreme Court of Virginia, requesting that the defendant, Patent Quality Assurance, LLC

answer this First Set of Requests for Admissions (the "Requests") within twenty-eight (28) days

of the date of service hereof.

Should VLSI have to incur any expenses to compel answers to these Requests, the

provisions of Va. R. Sup. Ct. 4:12(a)(4) on awarding expenses will apply. Furthermore, if you fail

to admit the genuineness of any document or the truth of any matter as requested herein under Va.

R. Sup. Ct. 4:11, and if VLSI thereafter proves the genuineness of the document or the truth of the

matter, pursuant to Va. R. Sup. Ct. 4:12(c), VLSI may move for an order requiring you to pay it

the reasonable expenses incurred in making that proof, including attorney's fees.

### DEFINITIONS AND INSTRUCTIONS

A.      The terms "**PQA**," "**you**," and "**your**" mean the defendant Patent Quality

Assurance, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants,

contractors, employees, managers, members, officers, representatives, and any other person or

entity under PQA's direction or control.

B.    The terms "**plaintiff**" and "**VLSI**" mean VLSI Technology LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under VLSI's direction or control.

C.    The term "**Uradnik**" means the defendant Joseph Uradnik, as well as his accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, representatives, and any other person or entity under Uradnik's direction or control.

D.    The term "**OpenSky**" refers to OpenSky Industries, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under OpenSky's direction or control.

E.    Unless otherwise defined in these Requests, terms and acronyms have the same meaning as they do in that pleading.

F.    If you do not admit a request, set forth in detail the reasons why the matter cannot be admitted.

G.    A denial of any of these requests shall fairly meet the substance of the request. When good faith and the Rules require that you qualify your answer or deny only a part of the request, then specify so much of it as is true and qualify and deny only the remainder.

H.    Unless otherwise indicated below, the relevant time period for these Requests is from March 2, 2021through the present.

## REQUESTS FOR ADMISSION

1.    PQA does not make any products.

2.    PQA does not sell any products.

2

3.      PQA does not use any product that uses the technology in U.S. Patent No. 7,523,373 (the "'373 Patent") or U.S. Patent No. 7,725,759 (the "'759 Patent").

4.      PQA has never had any plans to develop a product that uses the technology in the '373 Patent or the '759 Patent.

5.      PQA's principals did not take action to form PQA until after the March 2, 2021 verdict in *VLSI Technology LLC v. Intel Corp.*, Case No. 21-cv-00057-ADA, United States District Court for the Western District of Texas.

6.      Prior to forming PQA, those responsible for forming PQA communicated with each other about a monetary settlement with VLSI.

7.      The primary purpose of the formation of PQA was to endeavor to obtain a monetary payment from VLSI.

8.      PQA's organizer Morgan Noble is a fictitious person.

9.      During settlement discussions with VLSI, PQA declined to disclose the names of PQA's principals or members.

10.     During settlement discussions with VLSI related to PQA's IPR challenging the '373 Patent, PQA threatened to file a second IPR petition related to the '759 Patent unless VLSI paid PQA.

11.     After it had retained Dr. Adit Singh in connection with its own petition challenging the '373 Patent, PQA did not allow Dr. Singh to provide testimony in support of OpenSky's IPR petition challenging the '373 Patent.

3

February 5, 2024

$\mathcal{E}h\partial.\,\mathcal{b}$

Ellen D. Marcus (Virginia Bar No. 44314)
HOLMES COSTIN & MARCUS PLLC
908 King Street, Suite 330
Alexandria, Virginia 22314
(703) 991-7951
emarcus@hcmlawva.com

Michael S. Schachter (*pro hac vice* application
forthcoming)
Steven J. Ballew (*pro hac vice* application
forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019
(212) 728-8000
mschachter@willkie.com
sballew@willkie.com

Joshua L. Solomon (*pro hac vice* application
forthcoming)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, Massachusetts 02116
jsolomon@pdsfirm.com
(617) 960-0556

*Counsel to Plaintiff VLSI Technology LLC*

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA

VLSI TECHNOLOGY LLC,

      Plaintiff,

  v.

                           Civil Action No. CL 24001093

PATENT QUALITY ASSURANCE, LLC and
JOSEPH URADNIK,

      Defendants.

### PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT PATENT QUALITY ASSURANCE, LLC

COMES NOW the plaintiff, VLSI Technology LLC, by counsel, and pursuant to Rule 4:9 of the Supreme Court of Virginia, requesting that the defendant, Patent Quality Assurance, LLC answer this First Request for Production of Documents (the "Requests") within twenty-eight (28) days from the service hereof. All documents requested herein should be produced for inspection and copying to the office of Holmes Costin & Marcus PLLC, 908 King Street, Suite 330, Alexandria, Virginia 22314.

If you fail to timely produce any of the requested documents or if your responses are otherwise insufficient, VLSI may move for an Order to Compel which, if granted by the Court with a finding that your refusal or failure to sufficiently answer was without substantial justification, may require you, your attorney, or both, to pay the expenses that VLSI reasonably incurred in obtaining the Order to Compel, including but not limited to its reasonable attorney's fees.

## DEFINITIONS AND INSTRUCTIONS

A.      The terms "**PQA**," "**you**," and "**your**" mean the defendant Patent Quality Assurance, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under PQA's direction or control.

B.      The terms "**plaintiff**" and "**VLSI**" mean VLSI Technology LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under VLSI's direction or control.

C.      The term "**Uradnik**" means the defendant Joseph Uradnik, as well as his accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, representatives, and any other person or entity under Uradnik's direction or control.

D.      The term "**Intel**" refers to Intel Corporation, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, directors, employees, officers, representatives, and any other person or entity under Intel's direction or control.

E.      The term "**Northwest Registered Agent**" refers to Northwest Registered Agent, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under Northwest Registered Agent's direction or control.

F.      The term "**OpenSky**" refers to OpenSky Industries, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under OpenSky's direction or control.

G.      The term "**communication**" means both written and oral disclosures, transfers, or

2

exchanges of information or opinion, however made.

H.     The term "**document**" means any handwritten, recorded, graphic, photographic, printed, typed or otherwise transcribed matter, whether on paper, tape, cards, disks, drives, charts, cloud storage, film, magnetic storage, or any other medium or detection device. By way of illustration, and in no way limiting the scope of the term, "**document**" includes all written communications, agreements, calendars and planners (electronic or hard copy), bills, bulletins, books, bookkeeping entries, charts, checks, code, contracts, data compilations, data sheets, demands, diaries, directives, direct messages, disks, drafts, drawings, drives, e-mails, electronic files, expense reimbursement statements, financial journals, financial statements, instant messages, ledgers, letters, literature, log books, logs, notebooks, notes, notices, photographs, presentations (including PowerPoint presentations), printouts, receipts, recordings, records, reports, research, screenshots, slide decks, slideshows, social media posts, speeches, spreadsheets, software, statements, statistics, telegrams, text messages, transcriptions, videos, word processing documents, work assignments and work sheets, whether prepared by you or on your behalf for your own use or for transmittal, or received by you, and wherever located. The word "**document**" also includes all copies unless such copies (including any marks thereon) are exact duplicates of documents that are produced.

I.     The terms "**refer**" and "**relate**," as to any given subject, mean anything that constitutes, contains, embodies, reflects, identifies, states, deals with, or is in any manner whatsoever pertinent to the subject, including, but not limited to, documents concerning the preparation of any documents.

J.     The term "**agreement**" means a contract, arrangement or understanding, formal or informal, oral or written, between two or more persons.

3

K.     The term "**person**" means any natural person, corporation, company, partnership, joint venture, firm, association, or any other business or legal entity, whether private or governmental.

L.     Unless otherwise defined in these Requests, terms and acronyms have the same meaning as they do in that pleading.

M.     Each use of the singular form herein shall be deemed to include the plural form and vice versa. Use of the word "or" includes the word "and," and vice versa.

N.     Your answers to these Requests are directed at all documents within your possession, custody, or control, and also include all documents within the possession, custody, or control of your accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under your control.

O.     For each and every Request for Production that you withhold documents in whole or in part for any reason (including, but not limited to, by claiming it is privileged or subject to protection as trial preparation material), or for which you have otherwise limited the search, collection, and preservation of documents based upon any asserted objection, produce a privilege log pursuant to Va. R. Sup. Ct. 4:1(b)(6) identifying with specificity:

       i.  The type of document.

      ii.  The number of pages in the document.

     iii.  The name and designation or capacity of the author/creator of the document.

     iv.  The name and designation or capacity of each recipient.

      v.  The date(s) of the information or the date(s) on which the document was prepared, created, sent, and/or shared.

4

vi. The title and/or description of the information or document.

vii. The subject matter(s) addressed in the information or document.

viii. The purpose(s) for which the information or document was prepared or communicated.

ix. The specific objection(s), privilege(s), and/or protection(s), if any, claimed as to the identification, description, and/or production of each and every individual document, along with the facts relied upon in support of the objection(s), privilege(s), and/or protection(s).

x. The persons having knowledge of any facts related to the claim of work product or privilege.

P. These Requests are continuing in nature. You shall provide, as supplemental documents, such additional documents that you obtain or discover which will augment or otherwise modify your production given in response to these Requests. You shall make such supplemental productions promptly after discovery of such supplemental documents, but in any event prior to the date of trial.

Q. Unless otherwise indicated below, the relevant time period for these Requests is from March 2, 2021through the present.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. All documents relating to any of the allegations in the Complaint, including but not limited to all documents that tend to support or refute the allegations.

2. All documents and communications relating to PQA's organization and formation.

3. All documents and communications relating PQA's business, operations, or purpose.

5

4. All documents and communications, including but not limited to organizational charts, sufficient to show PQA's organizational structure.

5. All documents sufficient to identify PQA's current and/or former members, managers, and officers.

6. All document concerning any funds provided to you to support your operations and expenses, including but not limited to loans, capital contributions, donations, and investments.

7. All documents reflecting PQA's interest or concern regarding the integrity of the patent system.

8. All documents and communications relating to PQA's mission or business plan including its goals and its plans to achieve them.

9. All documents and communications relating to PQA's use, development, or sale of any product using the technology that is the subject of U.S. Patent No. 7,523,373 (the "'373 Patent") or U.S. Patent No. 7,725,759 (the "'759 Patent").

10. All documents and communications relating to PQA's development or sale of any product.

11. All documents and communications relating to PQA's funding, its potential or actual revenue and costs, and the future or actual allocation of any of its profits.

12. PQA's quarterly and annual financial statements.

13. All documents and communications relating to any IPR proceedings concerning the '373 Patent or the '759 Patent, including but not limited to the filing of any petition for, joinder in, settlement of, or potential termination of and such proceedings.

14. All documents and communications relating to PQA's retention of and payment to Dr. Adit Singh in connection with any IPR related to the '373 Patent.

15.     All non-privileged documents relating to PQA's retention of and payment to the Slayden Grubert Beard PLLC law firm in connection with any IPR related to the '373 Patent.

16.     All documents and communications relating to any real party-in-interest in any IPR proceedings concerning the '373 Patent or the '759 Patent, including but not limited to decisions made to list or not list any person or entity as a real party-in-interest.

17.     All documents and communications referring or relating to Uradnik., including but not limited to all documents and communications relating to his association and work with PQA, his authority to speak or act on behalf of PQA, any compensation arrangement with Uradnik, or his May 5, 2022 deposition, including but not limited to:

    i. all correspondence with or relating to Uradnik;

    ii. all agreements with or relating to Uradnik;

    iii. all e-mails and text messages with or relating to Uradnik;

    iv. all notes relating to Uradnik;

    v. all documents ever provided to you by Uradnik;

    vi. all documents ever provided by you to Uradnik;

    vii. all calendar appointments relating to Uradnik; and

    viii. all documents relating to any meetings or calls with Uradnik.

18.     All documents and communications referring or relating to Morgan Noble, including but not limited to:

    i. all correspondence with or relating to Morgan Noble;

    ii. all agreements with or relating to Morgan Noble;

    iii. all e-mails and text messages with or relating to Morgan Noble;

    iv. all notes relating to Morgan Noble;

      v.  all documents ever provided to you by Morgan Noble;

     vi.  all documents ever provided by you to Morgan Noble;

    vii.  all calendar appointments relating to Morgan Noble; and

   viii.  all documents relating to any meetings or calls with Morgan Noble.

19.    All documents referring, relating to, or evidencing any payments by you or anyone on your behalf, or to you or anyone on your behalf, to or from Uradnik, including but not limited to, all invoices, bills, statements of account, checks, receipts, expenses, expense lists, and documents evidencing wire or bank transfers or credit card payments, pay stubs, W-2s, 1099s or any other evidence of payment or reimbursement made by you or anyone on your behalf to Uradnik or anyone on Uradnik's behalf or from Uradnik or anyone on Uradnik's behalf to you or anyone on your behalf.

20.    All documents and communications referring or relating to Intel, including but not limited to:

      i.  all correspondence with or relating to Intel;

     ii.  all agreements with or relating to Intel;

    iii.  all e-mails and text messages with or relating to Intel;

    iv.  all notes relating to Intel;

     v.  all documents ever provided to you by Intel;

     vi.  all documents ever provided by you to Intel;

    vii.  all calendar appointments relating to Intel; and

   viii.  all documents relating to any meetings or calls with Intel.

21.    All documents referring, relating to, or evidencing any payments by you or anyone on your behalf, or to you or anyone on your behalf, to or from Intel (directly or indirectly),

8

including but not limited to, all invoices, bills, statements of account, checks, receipts, expenses, expense lists, and documents evidencing wire or bank transfers or credit card payments, or any other evidence of payment or reimbursement made by you or anyone on your behalf to Intel or anyone on Intel's behalf or from Intel or anyone on Intel's behalf to you or anyone on your behalf.

22.  All documents and communications referring or relating to Northwest Registered Agent, including but not limited to:

  i. all correspondence with or relating to Northwest Registered Agent;

  ii. all agreements with Northwest Registered Agent;

  iii. all e-mails and text messages with or relating to Northwest Registered Agent;

  iv. all notes relating to Northwest Registered Agent;

  v. all documents ever provided to you by Northwest Registered Agent;

  vi. all documents ever provided by you to Northwest Registered Agent;

  vii. all calendar appointments relating to Northwest Registered Agent; and

  viii. all documents relating to any meetings or calls with Northwest Registered Agent.

23.  All documents and communications referring or relating to OpenSky, including but not limited to:

  i. all correspondence with or relating to OpenSky;

  ii. all agreements with or relating to OpenSky;

  iii. all e-mails and text messages with or relating to OpenSky;

  iv. all notes relating to OpenSky;

  v. all documents ever provided to you by OpenSky;

      vi.  all documents ever provided by you to OpenSky;

      vii.  all calendar appointments relating to OpenSky; and

      viii.  all documents relating to any meetings or calls with OpenSky.

24.     All documents and communications referring or relating to VLSI, including but not

limited to:

      i.  all correspondence with or relating to VLSI;

      ii.  all agreements with or relating to VLSI;

      iii.  all e-mails and text messages with or relating to VLSI;

      iv.  all notes relating to VLSI;

      v.  all documents ever provided to you by VLSI;

      vi.  all documents ever provided by you to VLSI;

      vii.  all calendar appointments relating to VLSI; and

      viii.  all documents relating to any meetings or calls with VLSI.

February 5, 2024

Ellen D. Marcus (Virginia Bar No. 44314)
HOLMES COSTIN & MARCUS PLLC
908 King Street, Suite 330
Alexandria, Virginia 22314
(703) 991-7951
emarcus@hcmlawva.com

Michael S. Schachter (*pro hac vice* application
forthcoming)
Steven J. Ballew (*pro hac vice* application
forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019
(212) 728-8000
mschachter@willkie.com
sballew@willkie.com

Joshua L. Solomon (*pro hac vice* application
forthcoming)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, Massachusetts 02116
jsolomon@pdsfirm.com
(617) 960-0556

*Counsel to Plaintiff VLSI Technology LLC*

USPS CERTIFIED MAIL

7022 2410 0003 3144 5127

HOLMES
COSTIN
MARCUS
PLLC
908 King Street, Suite 330 • Alexandria, Virginia 22314

Patent Quality Assurance, LLC
c/o Northwest Registered Agent, LLC
25 First Avenue SW, Suite A
Watertown, SD 57021



# COMMONWEALTH of VIRGINIA

POST OFFICE BOX 2452

## Secretary of the Commonwealth

RICHMOND, VIRGINIA 23218-2452

## NOTICE OF SERVICE OF PROCESS

Joseph Uradnik
30177 Arrowhead Road
Grand Rapids, MN 55744

2/9/2024

VLSI Technology LLC

vs.

Joseph Uradnik

**Summons and Complaint**

**Request for Production of Documents, Interrogatories, Request for Admissions**

Dear Sir/Madam:

You are being served with the enclosed notice under section 8.01-329 of the Code of Virginia which designates the Secretary of the Commonwealth as statutory agent for Service of Process.

If you have any questions about the matter, PLEASE contact the CLERK of the enclosed/below mentioned court or any attorney of your choice. Our office does not accept payments on behalf of debts. The Secretary of the Commonwealth's ONLY responsibility is to mail the enclosed papers to you.

COURT:

Alexandria Circuit Court
Courthouse
520 King Street, Ste 307
Alexandria, VA 22314

Service of Process Clerk
Secretary of the Commonwealth's Office

# Commonwealth of Virginia



Case No. CL24001093
Doc No: 3825169

# SUMMONS

## TO THE SHERIFF: YOU ARE HEREBY COMMANDED TO SERVE:

Serve:
Uradnik, Joseph
Secretary of the Commonwealth, Statutory Agent
P.O. Box 2452
Richmond, VA 23218

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**Appearance in person is not required by this summons.**

Done in the name of The Commonwealth of Virginia, the 5th day of February, 2024.

Margaret Chatman
Deputy Clerk

Greg Parks
Clerk, Circuit Court
520 King Street #307
Alexandria, VA 22314
(703) 746-4044

Copy to Serve

COMMONWEALTH OF VIRGINIA:
In the Circuit Court of the City of Alexandria

Case # CL24001093

STYLE: VLSI TECHNOLOGY LLC V PATENT QUALITY ASSURANCE LLC

Uradnik, Joseph
Serve: Secretary of the Commonwealth, Statutory Agent
P.O. Box 2452
Richmond, VA 23218

Copy to Serve

**AFFIDAVIT FOR SERVICE OF PROCESS ON THE
SECRETARY OF THE COMMONWEALTH**
Commonwealth of Virginia    VA. CODE §§ 8.01-301, -310, -329; 55-218.1; 57-51

Case No. _VLSI Technology LLC v. Patent Quali_

_____ Alexandria Circuit Court _____ Circuit Court

| VLSI Technology LLC | v. | Joseph Uradnik |
|---|---|---|
| 150 South Wacker Drive Suite 2400 | | 30177 Arrowhead Road |
| Chicago, IL, 60606 | | Grand Rapids, MN, 55744 |

TO THE PERSON PREPARING THIS AFFIDAVIT: You must comply with the appropriate requirements listed on the back of this form.

| Attachments: | [×] Summons and Complaint | [ ] Notice |
|---|---|---|
| | | [•] Request for Production of Documents, Interrogatories, Request for Admissions |

I, the undersigned Affiant, state under oath that
[×] the above-named defendant       [ ] _____
whose last known address is   [×] same as above  [ ] _____
1. [×] is a non-resident of the Commonwealth of Virginia or a foreign corporation and Virginia Code § 8.01-328.1(A) ___ applies (see NON-RESIDENCE GROUNDS REQUIREMENT on page 2).
2. [ ] is a person whom the party seeking service, after exercising due diligence, has been unable to locate (see DUE DILIGENCE REQUIREMENT ON BACK)

_____ is the hearing date and time on the attached process or notice (if applicable)

_February 5, 2024_   _Eh. D. h_
DATE    [ ] PARTY [✓] PARTY'S ATTORNEY [ ] PARTY'S AGENT [ ] PARTY'S REGULAR AND BONA FIDE EMPLOYEE

State of _Virginia_    [✓] City [ ] County of _Alexandria_

Acknowledged, subscribed and sworn to before me this day by _Ellen D. Marcus_
PRINT NAME OF SIGNATORY

_2|5|24_    _Elnn. G_
DATE    [ ] CLERK  [ ] MAGISTRATE  [×] NOTARY PUBLIC

Notary Registration No. _____ My commission expires. _06/30/2025_

[ ] Verification by the clerk of court of the date of filing of the certificate of compliance is requested. A self-addressed stamped envelope was provided to the clerk at the time of filing this Affidavit.

*(notary seal: ELLEN M. COSTIN — NOTARY PUBLIC — REG. # 177503 — COMMONWEALTH — COMMISSION EXPIRES 06/30/2025)*

NOTICE TO THE RECIPIENT from the Office of the Secretary of the Commonwealth of Virginia:
You are being served with this notice and attached pleadings under Section 8.01-329 of the Code of Virginia which designates the Secretary of the Commonwealth as statutory agent for Service of Process. The Secretary of the Commonwealth's ONLY responsibility is to mail, by certified mail, return receipt requested, the enclosed papers to you. If you have any questions concerning these documents, you may wish to seek advice from a lawyer.
SERVICE OF PROCESS IS EFFECTIVE ON THE DATE WHEN SERVICE IS MADE ON THE SECRETARY OF THE COMMONWEALTH.

**CERTIFICATE OF COMPLIANCE**
I, the undersigned, Clerk in the Office of the Secretary of the Commonwealth, hereby certify the following:

1. On _FEB 0 9 2024_, legal service in the above-styled case was made upon the Secretary of the Commonwealth, as statutory agent for persons to be served in accordance with Section 8.01-329 of the Code of Virginia, as amended.

2. On _FEB 1 2 2024_, papers described in the Affidavit and a copy of this Affidavit were forwarded by certified mail, return receipt requested, to the party designated to be served with process in the Affidavit.

_____
SERVICE OF PROCESS CLERK, DESIGNATED
BY THE AUTHORITY OF THE SECRETARY OF THE COMMONWEALTH

**NON-RESIDENCE GROUNDS REQUIREMENT:**
If box number 1 is checked, insert the appropriate subsection number:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

1.  Transacting any business in this Commonwealth;

2.  Contracting to supply services or things in this Commonwealth;

3.  Causing tortious injury by an act or omission in this Commonwealth;

4.  Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth;

5.  Causing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth when he might reasonably have expected such person to use, consume, or be affected by the goods in this Commonwealth, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth;

6.  Having an interest in, using, or possessing real property in this Commonwealth;

7.  Contracting to insure any person, property, or risk located within this Commonwealth at the time of contracting;

8(ii). Having been ordered to pay spousal support or child support pursuant to an order entered by any court of competent jurisdiction in this Commonwealth having *in personam* jurisdiction over such person; or

10. Having incurred a liability for taxes, fines, penalties, interest, or other charges to any political subdivision of the Commonwealth.

**DUE DILIGENCE REQUIREMENT:**

If box number 2 is checked, the following provision applies:

When the person to be served is a resident, the signature of an attorney, party or agent of the person seeking service on such affidavit shall constitute a certificate by him that process has been delivered to the sheriff or to a disinterested person as permitted by § 8.01-293 for execution and, if the sheriff or disinterested person was unable to execute such service, that the person seeking service has been unable, after exercising due diligence, to locate the person to be served.

**VIRGINIA:**

### IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA

| | |
|---|---|
| **VLSI TECHNOLOGY LLC,** | |
| 150 South Wacker Drive, Suite 2400<br>Chicago, IL 60606 | |
| **Plaintiff,** | |
| **v.** | |
| **PATENT QUALITY ASSURANCE, LLC,** | |
| Last known address of person to be served:<br>Northwest Registered Agent, LLC<br>25 First Avenue SW, Suite A<br>Watertown, SD 57021 | Civil Action No. _CL24001093_ |
| **AND** | |
| **JOSEPH URADNIK,** | |
| Last known address of person to be served:<br>Joseph Uradnik<br>30177 Arrowhead Road<br>Grand Rapids, MN 55744 | |
| **Defendants.** | |



FILED
CLERK OF COURTS
CITY OF ALEXANDRIA
2024 JAN 31  PM 1:30
J. GREG PARKS, CLERK
BY
DEPUTY CLERK

### COMPLAINT

Plaintiff VLSI Technology LLC ("VLSI"), by and through its undersigned counsel, pleads

the following against defendants Patent Quality Assurance, LLC ("PQA") and Joseph Uradnik

("Uradnik") (collectively, the "Defendants"), and alleges as follows:

### PRELIMINARY STATEMENT

1.　　This is an action for abuse of process, fraud, and civil conspiracy arising out of

Defendants' scheme to wrongly use an administrative trial proceeding called *inter partes* review

("IPR"), and its processes and procedures, to harass and attempt to extort tens of millions of dollars

1

from VLSI, rather than for the proper purpose of obtaining review of the patentability of one or more patent claims.

2.      Months after VLSI was awarded one of the largest patent infringement verdicts in history against Intel Corporation ("Intel") for infringement of two VLSI patents, PQA initiated IPR proceedings before the Patent Trial and Appeal Board (the "PTAB"). Uradnik and PQA then prosecuted the case, misusing PTAB processes and procedures in an attempt to pressure VLSI to pay them millions of dollars to drop the case. That was their true purpose: to extract money from VLSI, not to have the validity of VLSI's patent claims determined.

3.      PQA did not even exist before VLSI's verdict. PQA has no legitimate interest in the validity of any VLSI patent. It does not make, use, or sell any products. It faces no risk of being sued for patent infringement. Defendants abused discovery and other procedures of the PTAB throughout the IPR proceeding by refusing to reveal the true nature of PQA, who or what was behind it, and their actual motivations in pursuing an IPR against VLSI.

4.      Uradnik has no legitimate interest in the patentability of VLSI's patents, either. Throughout the proceedings, he steadfastly refused to identify himself as anyone other than an "authorized representative" of PQA. Even after being asked repeatedly at his deposition to testify as to the true nature of his relationship with PQA, and to identify the people behind PQA and their interests, he refused to answer.

5.      Defendants' true purpose was extortion. Their repeated abuses of the processes and procedures of the IPR revealed that purpose, including: (a) falsely representing to the PTAB that PQA had an "exclusive" relationship with an expert in order to get a competing IPR petition dismissed; (b) threatening to file, and then actually filing, a second IPR petition when VLSI refused to pay the exorbitant sums of money that Defendants demanded to drop the case; (c) engaging in

brazen discovery misconduct to keep the identity of PQA's principals, and the true purposes for its creation, hidden from VLSI and the PTAB; and (d) willfully and repeatedly violating the discovery orders of the Director of the U.S. Patent and Trademark Office (the "USPTO") directing PQA to reveal its true nature and origins.

6.     As a direct result of Defendants' abusive tactics, VLSI was forced to defend against an abusive IPR petition and engage in needless discovery, causing VLSI damages including attorneys' fees and costs. VLSI should be made whole for Defendants' abuses, which are tortious and a violation of Virginia law. In her decision to sanction PQA for its misconduct, the Director of the USPTO expressly found that she was not deciding whether VLSI suffered compensable injury from Defendants' abuse of process. That open question should now be decided.

## THE PARTIES

7.     Plaintiff VLSI is a Delaware limited liability company duly organized and existing under the laws of the State of Delaware. Its principal place of business is 150 South Wacker Drive, Suite 2400, Chicago, IL 60606.

8.     PQA is a limited liability company organized under the laws of South Dakota. The address of the registered office of PQA is Northwest Registered Agent, 25 First Avenue SW, Suite A, Watertown, SD 57021. The Name of PQA's registered agent is Northwest Registered Agent.

9.     Upon information and belief, Defendant Joseph Uradnik is an individual who is a citizen of Minnesota and is domiciled at 30177 Arrowhead Road, Grand Rapids, MN 55744. Uradnik testified that he was authorized by the undisclosed members of PQA to speak on PQA's behalf during IPR proceedings.

3

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over Defendants because Defendants transacted business in the Commonwealth and caused tortious injury to VLSI by acts and omissions in the Commonwealth, where Defendants filed petitions to initiate the IPR proceedings and then abused the PTAB's processes and procedures in prosecuting the petitions.

11.     Venue is proper in this Court because all or part of the cause of action arose in Alexandria, and evidence (including the IPR file) and witnesses to the action are in Alexandria.

## FACTUAL BACKGROUND

### I.     THE PTAB AND *INTER PARTES* REVIEW

12.     This case involves abuse of process before a tribunal within the USPTO called the PTAB, which is headquartered in Alexandria, Virginia.

13.     IPR proceedings are trial procedures that permit third parties to challenge the validity of patents issued by the USPTO. IPRs are intended to provide a quick and cost-effective alternative to patent infringement litigation, thus fostering a more efficient and streamlined patent system that ultimately will improve patent quality.

14.     In an IPR proceeding, the PTAB can only determine whether a certain invention is patentable. It has no authority to award a party challenging a patent damages or to compensate a petitioner for successfully invalidating a patent claim.

15.     The statute creating IPR provides that—with one critical exception—any person who is not the owner of a patent may file with the USPTO a petition to institute IPR proceedings with respect to the patent. According to that exception, an IPR may not be instituted if the petition requesting the IPR proceeding is filed more than one year after the petitioner, real party-in-interest, or privy of the petitioner is served with a complaint alleging patent infringement. Petitioners are

4

therefore required to identify all real parties in interest. If the petitioner identifies a real party-in-interest that is time-barred, the PTAB must deny the petition for IPR. An otherwise time-barred party may, however, join an already instituted IPR.

16.     If the PTAB invalidates a patent in an IPR proceeding after a jury awards damages to a patent owner in an infringement action, the infringer may seek to have the damages award vacated on the basis of the PTAB's finding of invalidity, provided that the underlying infringement action has not reached final non-appealable judgment.

17.     All documents filed with the PTAB must be signed under oath and with a representation that they are not being filed for an improper purpose.

18.     Bad faith actors have an incentive to abuse the IPR process and game the system by trying to extort millions of dollars out of patent owners who have successfully enforced their patent rights in court. Such actors may improperly seek to file IPR petitions in bad faith with the end goal of ultimately dismissing the petition before the PTAB institutes an IPR proceeding in exchange for a windfall from the patent owner's damages award.

19.     As described below, Defendants are such bad faith actors who engaged in a brazen abuse of the IPR process.

## II.     VLSI'S HISTORIC JURY VERDICT AGAINST INTEL FOR PATENT INFRINGEMENT

20.     On April 11, 2019, VLSI filed a patent infringement suit against Intel in the U.S. District Court for the Western District of Texas ("WDTX"). The complaint alleged that Intel infringed multiple semiconductor technology patents owned by VLSI, including U.S. Patent Nos. 7,523,373 (the "'373 Patent") and 7,725,759 (the "'759 Patent").

21.     After VLSI filed its complaint, in late 2019 and early 2020, Intel filed IPR petitions with the PTAB arguing that the '373 Patent and '759 Patent were invalid. The PTAB declined to

institute IPRs on the basis that the WDTX action (which included defenses similar to those posed by Intel in the proposed IPRs) was nearing trial and thus, any PTAB proceedings would be duplicative of the WDTX's assessment of validity.

22.     After Intel's IPR petitions were dismissed by the PTAB, a jury trial commenced on February 22, 2021 in the WDTX. On March 2, 2021, after a five-day trial, a jury returned a verdict in favor of VLSI. The jury specifically found that (a) all asserted claims of the '373 Patent were literally infringed by Intel and all asserted claims of the '759 Patent were infringed by Intel under the doctrine of equivalents; (b) no asserted claim of the '759 Patent was invalid; and (c) VLSI was entitled to $1.5 billion of lump sum damages for Intel's infringement of the '373 Patent and $675 million in lump sum damages for Intel's infringement of the '759 Patent.

23.     Following entry of the verdict, Intel moved for judgment as a matter of law and a new trial. The Court denied Intel's motion and, on April 21, 2022, entered final judgment, which included the following:

      a. Intel was found to have infringed all claims at issue in the '373 and '759 Patents;

      b. Judgment was entered against Intel on its counterclaims of noninfringement of the asserted claims of both the '373 and '759 Patents;

      c. Judgment was entered against Intel on its counterclaims of invalidity of the '373 and '759 Patents;

      d. The claims VLSI asserted on the '759 Patent were found to be not invalid;

      e. The Court awarded $1.5 billion to VLSI for Intel's infringement of the '373 Patent claims and $675 million to VLSI for Intel's infringement of the '759 Patent claims; and

f.   The Court additionally awarded VLSI prejudgment interest in the amount of $162,321,343.

24.     After judgment was entered in the WDTX infringement action, Intel had no lawful ability to again petition the PTAB for an IPR with respect to the '373 and '759 Patents. As described above, no petition for an IPR may be filed more than one year after the date on which the petitioner, a real party-in-interest, or a privy of the petitioner is served with a complaint alleging infringement. Nor could a petition lawfully be filed by any petitioner if Intel was a real party-in-interest or in privity with the petitioner.

25.     While Intel, its privies, and anyone representing Intel as the real party-in-interest were legally barred from initiating an IPR directed at either of the patents that it was found to have infringed, that bar did not categorically preclude an entity that was independent of Intel from challenging the validity of the patents in an IPR. Nor did it preclude Intel from joining an already-instituted IPR proceeding.

## III.   PATENT QUALITY ASSURANCE IS SUDDENLY CREATED ON THE HEELS OF THE VERDICT

26.     On or about June 14, 2021, approximately three months after the jury's almost $2.2 billion verdict against Intel, a mysterious entity called Patent Quality Assurance, LLC was formed in South Dakota. South Dakota law does not require an LLC formed there to identify its members.

27.     PQA was formed upon the application of a company called Northwest Registered Agent, LLC, which offers registered agent services to those seeking to form businesses.

28.     Northwest Registered Agent promotes itself as offering services that help mask the identities of those behind newly formed companies.

29.     In PQA's Articles of Organization filed with the South Dakota Secretary of State on or about June 14, 2021, Northwest Registered Agent identified "Morgan Noble" as the name of PQA's organizer.

30.     On information and belief, Morgan Noble is not a real person, but a fictitious identity used by Northwest Registered Agent around the country when forming entities for its clients. For example, Northwest Registered Agent used "Morgan Noble" when creating: a West Virginia entity called Center for Hope and Change LLC, a Delaware entity called Shao Partners LLC, a Massachusetts entity called Summit Statistics Solutions LLC, a Nevada entity called FLU LLC, and a Virginia entity called The PartyLady LLC.

31.     Many of the companies for which Northwest Registered Agent has used "Morgan Noble" as an organizer have been found to engage in wrongdoing, and/or do not operate as a legitimate company would. For example:

      a.  In March 2021, the Better Business Bureau issued a warning against TLS LLC after several individuals performed work for TLS but were never paid for their services.

      b.  Phoenix Solutions was allegedly used by former Speaker of the Tennessee House of Representatives, Glen Casada, to illegally launder campaign funds.

      c.  Tarantula Outlet LLC allegedly engaged in a scam involving exotic animals.

      d.  In December 2021, Hope and Change LLC had its business license revoked for failing to file an annual report with the West Virginia Secretary of State.

32.     PQA does not make, use, sell, or import any products, let alone any products that could subject it to claims of infringement of VLSI's patents. Rather, it was apparently created solely for the purpose of extorting VLSI by filing IPR petitions challenging the validity of its

patents before the PTAB and then offering to dismiss those petitions in exchange for exorbitant sums of money.

## IV.   **DEFENDANTS' IPR PETITON**

33.     On or around July 7, 2021, less than a month after its formation, PQA filed an IPR petition with the PTAB in Alexandria, Virginia challenging the validity of the '373 Patent claims that formed the basis of $1.5 billion of the $2.175 billion award against Intel.

34.     In support of its IPR petition, PQA filed a sworn declaration of defendant Uradnik. Uradnik stated in his declaration that "[n]o business entity is a member of, owns any interest in, or exerts control over [PQA]." He further stated that "[e]ach member of [PQA] is a United States citizen who is not employed by, does not work for, and is not affiliated with" Intel or VLSI. While he stated in his declaration that PQA was "owned and managed exclusively by its members," he did not disclose who those members were.

35.     PQA's petition was almost a verbatim copy of the IPR petition that Intel filed in 2019 challenging the '373 Patent, which the PTAB had declined to institute. Since PQA had no business aside from challenging VLSI's patents, and thus was not at risk of being sued for patent infringement, it disingenuously claimed that its sole purpose in seeking to invalidate the patent was "to instill confidence in the integrity of the patent system and to ensure that innovative U.S. companies (and their consumers) are not unfairly taxed by entities asserting invalid patents."

36.     Defendants' subsequent bad faith actions in prosecuting the IPR proceeding demonstrated that their true motive had nothing to do with the integrity of the patent system.

## V.   **DEFENDANTS' FALSE AND EVASIVE FILINGS WITH THE PTAB AND ATTEMPTS TO EXTORT VLSI**

37.     PQA's IPR petition was not the first to challenge the validity of the '373 Patent following the WDTX verdict. An earlier petition was filed by an entity called OpenSky Industries,

9

LLC ("OpenSky"), which similarly copied the invalidity arguments raised in Intel's failed 2019 petition. The USPTO Director ultimately sanctioned OpenSky for filing abusive IPR petitions.

38.     Defendants recognized that OpenSky's nearly identical challenge to VLSI's patent was a major obstacle to the success of their extortionate scheme. If IPR proceedings were instituted based on OpenSky's petition, it would make little sense for VLSI to pay a large settlement to PQA, because VLSI would be required to defend the validity of its patent regardless of whether PQA voluntarily dismissed its petition. Additionally, it is likely that the PTAB would have dismissed PQA's petition as duplicative if it instituted review based on OpenSky's petition. Thus, before trying to extract a large settlement from VLSI, Defendants knew that they needed to eliminate OpenSky's competing petition.

39.     Defendants misled the PTAB to get it to dismiss OpenSky's IPR petition. OpenSky attached to its petition a declaration from a technical expert, Dr. Adit Singh. This declaration had been prepared for Intel and filed with its failed 2019 IPR. OpenSky filed Dr. Singh's declaration without his knowledge and without retaining him.

40.     Four days after OpenSky filed its IPR petition, an unnamed "Petitioner" (who was in fact the people who would go on to form PQA) retained Dr. Singh. By the time PQA was created and filed its IPR petition, it argued that it had "exclusively" engaged Dr. Singh, and that its petition should therefore be granted in favor of OpenSky's earlier-filed petition because OpenSky could not present Dr. Singh for cross-examination. Based on PQA's representation about its exclusive retention of Dr. Singh, the PTAB found that OpenSky "brought forth the testimony of an expert that [OpenSky] likely cannot produce for cross-examination and will likely be excluded" as hearsay. Accordingly, on December 23, 2021, the PTAB concluded that OpenSky's '373 petition

did not warrant institution based on PQA's representation that OpenSky would have been unable to engage Dr. Singh. With that, the obstacle to Defendants' extortionate plan was removed.

41.    As USPTO Director Kathi Vidal later found, PQA's representation about its "exclusive" arrangement with Dr. Singh was false. In a December 2022 decision, Director Vidal "determin[ed] that PQA, through its counsel, abused the IPR process by advancing a misleading argument and a misrepresentation of fact by representing, in its Petition, that it had exclusively engaged Dr. Singh, a witness relied on by another party . . . OpenSky . . . in a parallel proceeding, and which representation it later qualified as *not* being an exclusive engagement."

42.    In addition to finding that PQA's representation about the nature of its relationship with Dr. Singh was false, USPTO Director Vidal found that PQA's behavior was inconsistent with its representations that it was challenging the '373 Patent to protect the integrity of the patent system. The Director found that PQA's behavior instead "show[ed] an intent to ensure that PQA, not OpenSky, would benefit monetarily from any [settlement] arrangement with VLSI." After all, if PQA's real motive for filing its petition was to protect the quality of the patent system, it would not care whether its petition or OpenSky's petition was the vehicle for invalidating the '373 Patent, and it would have made Dr. Singh available to OpenSky to challenge the patent. On the other hand, Defendants could extract a large settlement from VLSI only if OpenSky's petition was dismissed.

43.    On or around July 7, 2021, at the time Defendants filed their IPR petition with the PTAB, PQA served the same petition containing its representations about its exclusive relationship with Dr. Singh on counsel of record for VLSI.

44.    Had VLSI been aware of the true nature of PQA's relationship with Dr. Singh at the time PQA had filed its petition, it would have made that fact known to the PTAB.

11

45. After OpenSky's IPR petition was dismissed, Defendants saw that the time was right to demand an extortive settlement from VLSI. Understanding that PQA had no actual interest in challenging the '373 Patent, VLSI had earlier tried to engage in settlement discussions with PQA—efforts that PQA initially rebuffed. But after OpenSky's competing petition was dismissed, PQA communicated to VLSI that it was willing to dismiss its own IPR petition, and give up its purported mission to protect the integrity of the patent system, in exchange for exorbitant amounts of money.

46. PQA further threatened that, if VLSI didn't pay off PQA, it would file a motion to join the Opensky IPR seeking to invalidate the other patent underlying the verdict against Intel— the '759 Patent. Defendants followed through on their threat. Once Defendants realized that VLSI would not cave to their demand, PQA petitioned to join OpenSky's IPR seeking to invalidate the '759 Patent. Defendants' conduct caused VLSI to expend attorneys' fees on briefing to oppose PQA's joinder petition. PQA then voluntarily withdrew its retaliatory petition just two days before the PTAB's deadline for a decision on whether to grant the joinder request.

47. When it filed the IPR petition to join OpenSky's IPR challenging the '759 Patent, PQA once again represented to the PTAB that its purpose in doing so was to protect the integrity of the patent system—a motive that is belied by the fact that it threatened to file the petition only if VLSI did not agree to pay it to go away. Defendants thus used the legal process of the PTAB and the risk of an impending IPR institution decision as a threat to further their scheme to extort large sums of money from VLSI.

48. PQA's behavior during settlement discussions also demonstrated an intent to extort VLSI in the future. For example, PQA refused to bind its principals to any settlement or even identify to VLSI who its principals were. Without knowing who was behind PQA's creation, VLSI

would not have any assurances that the same principals would forego attempts to create a different entity and petition the PTAB for an IPR seeking to invalidate VLSI's patents in the future (perhaps even the next day).

49.    On January 26, 2022, over VLSI's objections, the PTAB instituted PQA's IPR seeking to invalidate the '373 patent. That same day, Intel sought to join the IPR proceeding that was instituted based on PQA's petition. The PTAB granted Intel's joinder request.

## VI.    DEFENDANTS ABUSE THE DISCOVERY PROCESS DURING THE IPR

50.    After the PTAB instituted the IPR based on PQA's petition, VLSI was entitled to take discovery of PQA's purported spokesperson Joseph Uradnik, who had filed the declaration in support of PQA's petition. During his deposition, VLSI's counsel sought to learn basic facts about PQA's formation, its membership, and its reasons for challenging VLSI's patent. Such discovery was relevant and important because, if PQA's purpose for filing its IPR petition was to extort a payment, VLSI could have sought to have the proceedings dismissed as a sanction for PQA's abuse of the IPR process. Additionally, if it turned out that Intel and PQA had coordinated their petitions to circumvent the time bar on Intel's petition, Intel also could have been dismissed from the proceedings or the IPR could have been de-instituted.

51.    Defendant Uradnik was deposed on May 5, 2022. Instead of answering VLSI's legitimate deposition questions about the nature and purpose of PQA and its membership, Uradnik stonewalled, claiming that PQA had not authorized him to answer any deposition question or to provide VLSI with any information whatsoever aside from the very limited representations he had made in his declaration accompanying PQA's IPR petition. Thus, Defendants willfully violated the rules governing depositions and the PTAB's discovery process and procedures.

52.     For example, during the deposition, counsel for VLSI asked Uradnik to identify the members of PQA. Uradnik refused to answer the question and instead responded that he was "not authorized to speak on that topic." Mr. Uradnik similarly refused to identify how many members of PQA existed and whether he himself was a member of PQA.

53.     VLSI's counsel also asked Uradnik to identify the persons who had a financial interest in PQA and whether Uradnik himself had a financial interest in PQA. Uradnik once again refused to answer the question and responded that he was "not authorized to speak" on that topic.

54.     Similarly, VLSI's counsel asked Uradnik various questions to determine the motive underlying PQA's formation. Such questions included whether PQA was formed to extort money from VLSI and whether PQA was legitimately concerned about the integrity of the U.S. patent system. Again, Uradnik refused to answer VLSI's counsel's questions and instead stated that he was not authorized to speak on those topics.

55.     VLSI's counsel also asked Uradnik whether PQA had coordinated with or communicated with Intel in any way prior to filing its IPR petition seeking to invalidate the '373 Patent. Uradnik once again refused to answer the question and stated that he was not authorized to speak on that topic.

## VII.   DEFENDANTS INTENTIONALLY USE THE IPR PROCESS TO DRIVE UP VLSI'S ATTORNEYS' FEES AND COSTS

56.     After the PTAB instituted IPR and joined Intel as a party, PQA's active participation in the proceedings was no longer necessary. Yet, even though PQA could not receive any benefit from the continued prosecution of its IPR petition—after all, the PTAB could not award it any compensation and it faced no risk of being sued by VLSI for patent infringement if the patent was found to be valid—after the PTAB instituted review, Defendants continued to use the PTAB's discovery process to increase VLSI's costs of litigating their abusive IPR.

14

57. For example, PQA deposed VLSI's expert. PQA also sought for the USPTO to exercise its power to conduct an *in camera* inspection of documents VLSI logged as privileged in response to discovery mandated by the USPTO Director and filed a frivolous motion to expunge certain documents from the record. Moreover, after the USPTO Director found that PQA abused the IPR process, PQA filed a frivolous mandamus petition with the Federal Circuit challenging that decision, which it later voluntarily withdrew.

58. PQA also asked the PTAB to exercise its power to provide joined petitioner Intel with access to sealed material in the record. As described above, if it was not for PQA's extortive petition, Intel would have been time-barred from filing a petition on its own and thus barred from accessing the sealed material.

59. In this and other ways, Defendants misused the processes and procedures of the IPR proceeding, which were enforceable by the PTAB and USPTO Director, for the improper purpose of increasing VLSI's costs of litigating the IPR after VLSI refused to yield to PQA's extortive settlement demands. Rather than promote the efficiency of the patent process, which was the intended purpose of the PTAB and IPR procedures, Defendants used those procedures as tools for harassment.

## VIII. THE USPTO DIRECTOR REVIEWS PQA'S CONDUCT IN THE IPR PROCEEDINGS FOR ABUSE OF PROCESS

60. On or around April 27, 2022, U.S. Senators Mazie Hirono and Thom Tillis sent a letter to USPTO Director Vidal expressing concern that PQA and OpenSky were abusing the IPR process by filing petitions seeking to invalidate the '373 and '759 patents in an apparent attempt to extort money from VLSI. The Senators explained that the IPR petitions were suspect from the outset based on the facts that (a) the entities were formed shortly before filing their petitions; (b) the entities did not make, use, sell, or import *any* products, let alone any products that could subject

them to claims of infringement; (c) the companies filed their petitions only after VLSI had secured a nearly $2.2 billion infringement verdict against Intel; and (d) the petitions filed by PQA and OpenSky were near carbon copies of petitions previously filed by Intel that had been rejected by the USPTO. The Senators concluded that PQA and OpenSky's "activities represent a clear abuse of the IPR system."

61.      On June 7, 2022, USPTO Director Vidal initiated Director review of the PTAB's decision to institute PQA's IPR. Citing the same concerns articulated by Senators Hirono and Tillis in their letter to her, Director Vidal ordered that the parties to the IPR file briefing to, *inter alia*, answer the following interrogatory questions:

   a.  When was PQA formed? For what purpose? What is the business of PQA? Who are members of PQA? Which other persons or entities have an interest in PQA or any of its activities including [the IPR] proceeding?

   b.  What is the relationship between PQA and each of the other parties [*i.e.*, VLSI and Intel]? Other than communications already in the record, what communications have taken place between PQA and each of the other parties?

   c.  Could PQA be subject to claims of infringement of the '373 patent? Does PQA have development plans to create a product that could arguably infringe the '373 patent? Does PQA have a policy reason for filing the Petition that benefits the public at large beside any reasons articulated in the already-filed papers?

   d.  Does the evidence in this proceeding demonstrate an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the [statute creating IPR proceedings] and, if so, which evidence and how should that evidence be weighted and addressed?

e.  What is the basis for concluding that there are no other real parties in interest, beyond PQA? Are there additional people or entities that should be considered as potential real parties in interest?

f.  Did PQA ever condition any action relating to this proceeding, including but not limited to delaying, losing, not participating in, withdrawing from, or taking action that will influence any experts' participation in this proceeding, on payment or other consideration by Patent Owner or anyone else?

62.  Additionally, Director Vidal ordered PQA to provide the following documents to VLSI:

i.  all documents filed with state, federal, and/or other governmental regulatory entities related to the formation of PQA and any communications related to the same or to the formation of PQA;

ii.  all documents relating to PQA's business plan including its funding, its potential revenue, and the future allocation of any of its profits;

iii.  all documents and communications relating to the filing, settlement, or potential termination of this proceeding, or experts in this proceeding, not already of record in the proceeding;

iv.  all documents and communications relating to the filing, settlement, or termination of any other *inter partes* review proceeding concerning the '373 patent, not already of record in this proceeding;

v.  all documents and communications with Dr. Adit Singh relating to his retention by PQA, including any agreements with him;

17

vi. all documents and communications relating to any real party in interest and decisions made to list or not list any person or entity as a real party in interest; and

vii. all communications with any named party related to the filing, settlement, or potential termination of this proceeding.

63.     PQA refused to comply, agreeing to provide only "third party" communications among PQA and OpenSky, VLSI, Intel, governmental entities, and Dr. Singh, but not any internal PQA communications, contrary to Director Vidal's mandated discovery order. PQA's response to Director Vidal's discovery order further suggested that it did not intend to log communications that it intended to withhold under a claim of privilege.

64.     PQA's representations that it would flout Director Vidal's July 20, 2022 discovery order prompted her to issue another order reaffirming that PQA was required to comply with the full scope of the mandated discovery. She also reiterated that "[n]o responsive document may be withheld without being included in a . . . privilege log."

65.     Despite Director Vidal's clear instructions, Defendants willfully violated her discovery orders. They failed to produce any responsive internal PQA documents and produced only a limited work product redaction log of communications between PQA's counsel and Dr. Singh. PQA's log did not identify any communications between PQA and its counsel that were withheld on the grounds of attorney-client privilege. As a result of Defendants' failure to produce any internal documents or a meaningful privilege log, VLSI could not identify with specificity any documents for Director Vidal's *in camera* review.

66.     In addition to their brazen violation of Director Vidal's mandated discovery order, Defendants also willfully evaded her interrogatories, which required PQA to respond with citations to supporting documentary evidence.

18

67.     For example, Director Vidal ordered PQA to disclose the purpose for which it was formed, what its business was, and who its members were. To answer these questions, PQA was required to produce materials including communications related to its formation and internal documents related to its business plan. Instead, PQA responded only that the "initial authorization of PQA is to challenge patent(s) to ensure patent quality." PQA refused to disclose its members, stating only that "PQA's members are United States citizens, none of whom are employed by, work for, or are affiliated with Intel, OpenSky, or VLSI." PQA also stated that "[n]o other persons or entities beyond PQA's members have an interest in PQA, its future revenues, profits, or obligations, or any of its activities including this proceeding."

68.     Director Vidal found PQA's answers to the above interrogatory questions to be unresponsive, as they "only make[] assertion[s] as to who [PQA's] members are not; [they] do[] not identify the members of PQA." Additionally, Director Vidal found that PQA did "not answer the interrogatory seeking the purpose for which PQA was formed, nor [did] PQA provide any required supporting evidence that would allow" her or VLSI "to verify that PQA's business interest is limited to ensuring patent quality." Director Vidal similarly found PQA's other interrogatory responses to be insufficient.

## IX.     DIRECTOR VIDAL FINDS THAT PQA ABUSED THE IPR PROCESS BUT PERMITS THE PROCEEDING TO CONTINUE

69.     On December 12, 2022, Director Vidal issued a decision finding that PQA abused the IPR process. She "determin[ed] that PQA, through its counsel, abused the IPR process by advancing a misleading argument and a misrepresentation of fact by representing, in its Petition, that it had exclusively engaged Dr. Singh, a witness relied on by another party . . . OpenSky . . . in a parallel proceeding, and which representation it later qualified as *not* being an exclusive engagement." In addition, Director Vidal determined that "PQA abused the IPR process by filing

this IPR, and threatening to file another IPR petition seeking to join a related, instituted IPR by OpenSky, in an attempt to extract payment from VLSI." Moreover, Director Vidal concluded that PQA engaged in discovery misconduct by failing to comply with her mandated discovery order and inadequately responding to her interrogatories.

70.     For abusing the IPR process and engaging in discovery misconduct, Director Vidal dismissed PQA from the IPR. However, over VLSI's objection, Director Vidal refused to terminate the IPR proceeding and permitted it to move forward with Intel (who would have been time-barred from filing its own IPR) as the sole petitioner. Director Vidal reached this conclusion despite the fact that Intel indisputably would have been time-barred if it had initiated the IPR on its own. However, because it joined PQA's IPR after the PTAB instituted proceedings, the time bar did not apply. Thus, because of Defendants' abusive IPR petition and tactics during the proceedings, Intel was able to prosecute an IPR proceeding that it would otherwise have been foreclosed from pursuing.

71.     On January 27, 2023, Director Vidal restored PQA as a petitioner in the IPR solely for the purpose of retaining jurisdiction over PQA so that it could respond to an order to show cause for why it should not be further sanctioned.

## X.     THE USPTO DIRECTOR SANCTIONS PQA FOR ITS MISCONDUCT, BUT DOES NOT AWARD VLSI FEES, AND SPECIFICALLY NOTES THAT WHETHER VLSI SUFFERED COMPENSABLE INJURY IS AN OPEN QUESTION

72.     On June 13, 2023, the PTAB issued a final written decision on the challenged claims of the '373 Patent and found all of the claims to be unpatentable. In other words, the PTAB effectively found the '373 Patent, which was a basis for the jury's verdict against Intel in WDTX, invalid.

73.     On August 8, 2023, on PQA's motion for reconsideration of her December 2022 decision that PQA had abused the IPR process, Director Vidal issued another decision finding that PQA had misrepresented the nature of its retention of Dr. Singh and determining that PQA had engaged in discovery misconduct. Once again, she concluded that PQA's conduct was sanctionable and issued another order to show cause for why PQA should not be required to pay VLSI's attorneys' fees.

74.     On December 13, 2023, Director Vidal issued a decision sanctioning PQA for its misconduct, despite the fact that she affirmed the PTAB's decision to ultimately invalidate VLSI's patent. Although Director Vidal issued a "strong admonishment to PQA for its conduct," she declined to impose monetary sanctions on PQA. In her sanctions decision, Director Vidal explicitly stated that she was not deciding whether VLSI "suffered . . . compensable injury stemming from PQA's alleged misconduct."

75.     To date, VLSI has not been compensated for the injuries it suffered as a result of PQA's abuse of the IPR proceeding and its processes and procedures—including the attorneys' fees and costs VLSI incurred.

### COUNT ONE
### ABUSE OF PROCESS
### (AGAINST ALL DEFENDANTS)

76.     Plaintiff incorporates by reference and realleges paragraphs 1 through 75 set forth above.

77.     Defendants had an ulterior purpose in using the processes and procedures of the IPR proceeding. Rather than genuinely seeking a determination on the patentability of the '373 Patent and '759 Patent—which Defendants had no interest in—their purpose was to harass VLSI,

run up its costs, and extort money from VLSI by offering to stop the challenge to the patents underlying its jury award if VLSI would just pay it to stop.

78.     Defendants' acts in the use of the processes and procedures were not proper in the regular course of the IPR proceedings, which included: repeatedly evading discovery and violating discovery rules; brazenly violating discovery orders; filing pleadings containing misrepresentations, including about who founded PQA and for what purpose, and PQA's relationship with its expert; serving unwarranted and harassing discovery on VLSI; and forcing VLSI to defend against frivolous motions.

79.     As a direct and proximate result of Defendants' abuse of process, VLSI has suffered damages in the amount of not less than $3.2 million, which includes the attorneys' fees and costs VLSI incurred in defending against the IPR proceeding and Defendants' abusive tactics.

80.     Defendants' abuse of process was willful, malicious, wanton, oppressive, done with conscious indifference to the consequences, and with specific intent to harm. Therefore, VLSI is entitled to an award of punitive damages from Defendants, and each of them, in an amount to be proven at trial and sufficient to punish, penalize, and deter Defendants from engaging in such conduct in the future.

## COUNT TWO
## COMMON LAW FRAUD
## (AGAINST ALL DEFENDANTS)

81.     VLSI incorporates by reference and realleges paragraphs 1 through 80 set forth above. Beginning on or around June 7, 2021, at the time Defendants filed PQA's IPR challenging the validity of the '373 Patent, they intentionally and falsely represented to VLSI and the PTAB that, among other things, PQA exclusively retained Dr. Singh and PQA's purpose in petitioning for and pursuing IPR proceedings was "to instill confidence in the integrity of the patent system

and to ensure that innovative U.S. companies (and their consumers) are not unfairly taxed by entities asserting invalid patents." As the USPTO Director later found, these representations were false or misleading.

82.     These false representations were of material facts. As the USPTO Director acknowledged, the PTAB denied OpenSky's competing IPR petition based on PQA's representations about its exclusive relationship with Dr. Singh. If it were not for Defendants' false representation, the PTAB would have dismissed PQA's petition as duplicative of OpenSky's. Additionally, the PTAB would not have instituted IPR based on PQA's petition if PQA had been honest that its motive for filing the petition was to extort VLSI.

83.     Defendants' false representations were made intentionally and knowingly, with the intent to mislead both VLSI and the PTAB.

84.     VLSI relied on Defendants' false representations, resulting in damages to VLSI. Had VLSI known the true nature of PQA's relationship with Dr. Singh or PQA's true purpose in pursuing IPR, VLSI would have brought it to the PTAB's attention, which would have resulted in the dismissal of PQA's petition, and saved VLSI millions of dollars in attorneys' fees and costs incurred to defend against the IPR.

85.     Importantly, PQA did not make its settlement demands known until on or around December 31, 2021—which was after it had eliminated OpenSky's competing petition and after the final briefing deadline to the PTAB related to institution of the IPR petition had passed. Had VLSI been aware that PQA intended to extort it sooner, it could have raised this issue with the PTAB before IPR proceedings had been instituted. PQA's misrepresentations about its true motives for filing an IPR petition were thus material, and VLSI relied on these misrepresentations to its detriment.

86.     As a direct and proximate consequence of PQA's fraud, VLSI suffered damages, including $3.2 million that it incurred in attorneys' fees and costs to defend against PQA's instituted IPR that VLSI would have avoided absent Defendants' fraud.

87.     Defendants' fraud was willful, malicious, wanton, oppressive, done with conscious indifference to the consequences, and with specific intent to harm. Therefore, VLSI is entitled to an award of punitive damages from Defendants, and each of them, in an amount to be proven at trial and sufficient to punish, penalize, and deter Defendants from engaging in such conduct in the future.

## COUNT THREE
## STATUTORY BUSINESS CONSPIRACY
## (AGAINST ALL DEFENDANTS)

88.     VLSI incorporates by reference and realleges paragraphs 1 through 87 set forth above.

89.     In violation of Va. Code §§ 18.2-499-501, PQA, Uradnik, and others combined, associated, agreed, mutually undertook, or concerted together for the purpose of willfully and maliciously injuring VLSI in its reputation, trade, business or profession.

90.     Among other things, Defendants agreed and combined to injure VLSI's business and reputation by abusing the processes and procedures of the IPR proceeding in violation of Virginia law and defrauding VLSI.

91.     As a direct and proximate result of Defendants' unlawful conspiracy, VLSI has suffered substantial monetary damages in an amount not less than $3.2 million, said damages to be proven at the time of trial.

92.     VLSI is entitled to an award of treble damages for Defendants' violations.

93.     VLSI is also entitled to an award of the costs of suit, including reasonable attorneys' fees and expenses, and any injunction the Court deems reasonable.

**COUNT FOUR**
**COMMON LAW CONSPIRACY**
**(AGAINST ALL DEFENDANTS)**

94.     VLSI incorporates by reference and realleges the allegations in paragraphs 1 through 93 set forth above. PQA, Uradnik, and others combined to accomplish, by some concerted action, some criminal or unlawful purpose, or some lawful purpose by criminal or unlawful means. Among other things, they combined to injure VLSI and extort money from VLSI by abusing the processes and procedures of the IPR proceedings in violation of Virginia law and defrauding VLSI.

95.     As a result of Defendants' unlawful conspiracy, VLSI has suffered substantial monetary damages in an in an amount not less than $3.2 million, said damages to be proven at the time of trial.

96.     Defendants' conspiratorial conduct was willful, malicious, wanton, oppressive, done with conscious indifference to the consequences, and with specific intent to harm. Therefore, VLSI is entitled to punitive damages sufficient to punish, penalize, and deter Defendants from engaging in such conduct in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.      Enter judgment in favor of VLSI on all counts;

2.      Award VLSI compensatory damages against Defendants in the amount VLSI proves at trial, not less than $3.2 million;

3.      Award VSLI punitive damages against Defendants to the maximum amount allowed by law;

4.     Award VLSI treble its compensatory damages against Defendants;

5.     Award VLSI its costs, including reasonable attorneys' fees and expenses, incurred

in connection with this action; and

6.     Grant such other relief as the case may require or as may be deemed proper and

equitable.

Dated: January 31, 2024                    Respectfully submitted,


Ellen D. Marcus (Virginia Bar No. 44314)
HOLMES COSTIN & MARCUS PLLC
908 King Street, Suite 330
Alexandria, Virginia 22314
(703) 991-7951
emarcus@hcmlawva.com

Michael S. Schachter (*pro hac vice* application
forthcoming)
Steven J. Ballew (*pro hac vice* application
forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019
(212) 728-8000
mschachter@willkie.com
sballew@willkie.com

Joshua L. Solomon (*pro hac vice* application
forthcoming)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, Massachusetts 02116
jsolomon@pdsfirm.com
(617) 960-0556

*Counsel to Plaintiff VLSI Technology LLC*

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature

X ☐ Agent ☐ Addressee

B. Received by *(Printed Name)* | C. Date of Delivery

1. Article Addressed to:

Joseph Uradnik
30177 Arrowhead Road
Grand Rapids, MN
55744

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

7022 2410 0003 3144 5196

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Ellen D. Marcos
Holmes Costin & Marcus PLLC
908 King Street, Suite 330
Alexandria, VA 22314-3067

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA

VLSI TECHNOLOGY LLC,

      Plaintiff,

      v.

PATENT QUALITY ASSURANCE, LLC and
JOSEPH URADNIK,

      Defendants.

Civil Action No. CL 24001093

### PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS
### TO DEFENDANT JOSEPH URADNIK

COMES NOW the plaintiff, VLSI Technology LLC ("VLSI"), by counsel, and pursuant

to Rule 4:11 of the Supreme Court of Virginia, requesting that the defendant, Joseph Uradnik

answer this First Set of Requests for Admissions (the "Requests") within twenty-eight (28) days

of the date of service hereof.

Should VLSI have to incur any expenses to compel answers to these Requests, the

provisions of Va. R. Sup. Ct. 4:12(a)(4) on awarding expenses will apply. Furthermore, if you fail

to admit the genuineness of any document or the truth of any matter as requested herein under Va.

R. Sup. Ct. 4:11, and if VLSI thereafter proves the genuineness of the document or the truth of the

matter, pursuant to Va. R. Sup. Ct. 4:12(c), VLSI may move for an order requiring you to pay it

the reasonable expenses incurred in making that proof, including attorney's fees.

### DEFINITIONS AND INSTRUCTIONS

A.      The terms "**Uradnik**," "**you**," and "**your**" mean the defendant Joseph Uradnik, as

well as his accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees,

representatives, and any other person or entity under Uradnik's direction or control.

B.      The terms **"plaintiff"** and **"VLSI"** mean VLSI Technology LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under VLSI's direction or control.

C.      The term **"PQA"** the defendant Patent Quality Assurance, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under PQA's direction or control.

D.      Unless otherwise defined in these Requests, terms and acronyms have the same meaning as they do in that pleading.

E.      If you do not admit a Request, set forth in detail the reasons why the matter cannot be admitted.

F.      A denial of any of these requests shall fairly meet the substance of the request. When good faith and the Rules require that you qualify your answer or deny only a part of the request, then specify so much of it as is true and qualify and deny only the remainder.

G.      Unless otherwise indicated below, the relevant time period for these Requests is from March 2, 2021 through the present.

## REQUESTS FOR ADMISSION

1.      The copy of your affidavit filed in support of PQA's IPR petition challenging U.S. Patent No. 7,523,373 (the "'373 Patent"), attached hereto as Exhibit A, is authentic within the meaning of the Virginia Rules of Evidence, and does not need to be authenticated for use in this litigation.

2.      The copy of your May 5, 2022 deposition, attached hereto as Exhibit B, is authentic

within the meaning of the Virginia Rules of Evidence and does not need to be authenticated for use in this litigation.

February 5, 2024

Ellen D. Marcus (Virginia Bar No. 44314)
HOLMES COSTIN & MARCUS PLLC
908 King Street, Suite 330
Alexandria, Virginia 22314
(703) 991-7951
emarcus@hcmlawva.com

Michael S. Schachter (*pro hac vice* application forthcoming)
Steven J. Ballew (*pro hac vice* application forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019
(212) 728-8000
mschachter@willkie.com
sballew@willkie.com

Joshua L. Solomon (*pro hac vice* application forthcoming)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, Massachusetts 02116
jsolomon@pdsfirm.com
(617) 960-0556

*Counsel to Plaintiff VLSI Technology LLC*

3

# EXHIBIT A

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent of: | Andrew C. Russel et al. |
| U.S. Patent No.: | 7,523,373 |
| Issue Date: | Apr. 21, 2009 |
| Appl. Serial No.: | 11/468,458 |
| Filing Date: | Aug. 30, 2006 |
| Title: | MINIMUM MEMORY OPERATING VOLTAGE TECHNIQUE |

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## DECLARATION OF JOSEPH A. URADNIK

PQA Ex. 1032-1

1. My name is Joseph A. Uradnik. I am over the age of 18, have personal knowledge of the facts set forth herein and am competent to testify to the same.

2. Petitioner Patent Quality Assurance, LLC has authorized me to speak on behalf of Petitioner regarding the facts set forth herein.

3. Petitioner is a South Dakota LLC formed on June 14 of 2021.

4. Petitioner is owned and managed exclusively by its members.

5. No business entity is a member of, owns any interest in, or exerts control over Petitioner.

6. Each member of Petitioner is a United States citizen who is not employed by, does not work for, and is not affiliated with Intel Corporation ("Intel") (petitioner in IPR2020-00158), OpenSky Industries, LLC ("OpenSky") (petitioner in IPR2021-01056), or patent owner, VLSI Technology, LLC ("VLSI").

7. Petitioner did not notify, discuss, or coordinate efforts on this petition for *inter partes* review with Intel, OpenSky, VLSI, or any other business entity.

8. Other than with the law firm filing this petition and with Dr. Singh and Dr. Hall-Ellis, Petitioner does not have any explicit or implicit agreements regarding this petition for *inter partes* review with Intel, OpenSky, VLSI, or any other person or entity.

PQA Ex. 1032-2

9. Petitioner exercised its sole discretion and control in preparing, deciding to
   file, and filing this petition for *inter partes* review.

10. Petitioner did not receive funds from Intel, OpenSky, VLSI, or any other
    business entity to prepare or file this petition for *inter partes* review.

11. Petitioner is not being reimbursed by Intel, OpenSky, VLSI, or any other
    business entity for expenses incurred in connection with preparation or filing
    of this petition for *inter partes* review.

12. I declare under penalty of perjury the forgoing is correct.

Dated: 7/7/2021

Signed,

Joseph A. Uradnik

# EXHIBIT B

Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD


PATENT QUALITY ASSURANCE, LLC,    )
    )
          Petitioner,    )
    )
   vs.    )  Case No.:
    )  IPR2021-01229
VLSI TECHNOLOGY LLC,    )  Patent 7,523,373
    )
          Patent Owner.  )
_____)


HIGHLY CONFIDENTIAL

VIDEOTAPED REMOTE DEPOSITION OF

JOSEPH A. URADNIK

GRAND RAPIDS, MINNESOTA

MAY 5, 2022


REPORTED BY:  SANDRA S. PETRITSCH, CSR NO. 11684

FILE NO. 824624

PROVISIONALLY DESIGNATED PROTECTIVE ORDER MATERIAL
VLSI Technology LLC, Exhibit 2060
Page 2060 - 1
IPR2021-01229, Patent Quality Assurance, LLC v. VLSI Technology LLC



# HIGHLY CONFIDENTIAL

# INFORMATION REDACTED

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA

VLSI TECHNOLOGY LLC,

        Plaintiff,

    v.

PATENT QUALITY ASSURANCE, LLC and
JOSEPH URADNIK,

        Defendants.

Civil Action No. CL 24001098

*FILED CLERK OF COURTS CITY OF ALEXANDRIA*
*2024 FEB -5 PM 12: 46*
*J. GREG PARKS, CLERK*
*BY ___ DEPUTY CLERK*

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT JOSEPH URADNIK

COMES NOW the plaintiff, VLSI Technology LLC, by counsel, and pursuant to Rule 4:9 of the Supreme Court of Virginia, requesting that the defendant, Joseph Uradnik, answer this First Request for Production of Documents (the "Requests") within twenty-eight (28) days from the service hereof. All documents requested herein should be produced for inspection and copying to the office of Holmes Costin & Marcus PLLC, 908 King Street, Suite 330, Alexandria, Virginia 22314.

If you fail to timely produce any of the requested documents or if your responses are otherwise insufficient, VLSI may move for an Order to Compel which, if granted by the Court with a finding that your refusal or failure to sufficiently answer was without substantial justification, may require you, your attorney, or both, to pay the expenses that VLSI reasonably incurred in obtaining the Order to Compel, including but not limited to its reasonable attorney's fees.

## DEFINITIONS AND INSTRUCTIONS

A.      The terms **"Uradnik,"** **"you"** or **"your"** mean the defendant Joseph Uradnik, as well as his accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, representatives, and any other person or entity under Uradnik's direction or control.

B.      The terms **"plaintiff"** and **"VLSI"** mean VLSI Technology LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under VLSI's direction or control.

C.      The term **"PQA,"** means the defendant Patent Quality Assurance, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under PQA's direction or control.

D.      The term **"Intel"** refers to Intel Corporation, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, directors, employees, officers, representatives, and any other person or entity under Intel's direction or control.

E.      The term **"Northwest Registered Agent"** refers to Northwest Registered Agent, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under Northwest Registered Agent's direction or control.

F.      The term **"OpenSky"** refers to OpenSky Industries, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under OpenSky's direction or control.

G.      The term **"communication"** means both written and oral disclosures, transfers, or

2

exchanges of information or opinion, however made.

H.      The term "**document**" means any handwritten, recorded, graphic, photographic, printed, typed or otherwise transcribed matter, whether on paper, tape, cards, disks, drives, charts, cloud storage, film, magnetic storage, or any other medium or detection device. By way of illustration, and in no way limiting the scope of the term, "**document**" includes all written communications, agreements, calendars and planners (electronic or hard copy), bills, bulletins, books, bookkeeping entries, charts, checks, code, contracts, data compilations, data sheets, demands, diaries, directives, direct messages, disks, drafts, drawings, drives, e-mails, electronic files, expense reimbursement statements, financial journals, financial statements, instant messages, ledgers, letters, literature, log books, logs, notebooks, notes, notices, photographs, presentations (including PowerPoint presentations), printouts, receipts, recordings, records, reports, research, screenshots, slide decks, slideshows, social media posts, speeches, spreadsheets, software, statements, statistics, telegrams, text messages, transcriptions, videos, word processing documents, work assignments and work sheets, whether prepared by you or on your behalf for your own use or for transmittal, or received by you, and wherever located. The word "**document**" also includes all copies unless such copies (including any marks thereon) are exact duplicates of documents that are produced.

I.      The terms "**refer**" and "**relate**," as to any given subject, mean anything that constitutes, contains, embodies, reflects, identifies, states, deals with, or is in any manner whatsoever pertinent to the subject, including, but not limited to, documents concerning the preparation of any documents.

J.      The term "**agreement**" means a contract, arrangement or understanding, formal or informal, oral or written, between two or more persons.

3

K.    The term **"person"** means any natural person, corporation, company, partnership, joint venture, firm, association, or any other business or legal entity, whether private or governmental.

L.    Unless otherwise defined in these Requests, terms and acronyms have the same meaning as they do in that pleading.

M.    Each use of the singular form herein shall be deemed to include the plural form and vice versa. Use of the word "or" includes the word "and," and vice versa.

N.    Your answers to these Requests are directed at all documents within your possession, custody, or control, and also include all documents within the possession, custody, or control of your accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under your control.

O.    For each and every Request for Production that you withhold documents in whole or in part for any reason (including, but not limited to, by claiming it is privileged or subject to protection as trial preparation material), or for which you have otherwise limited the search, collection, and preservation of documents based upon any asserted objection, produce a privilege log pursuant to Va. R. Sup. Ct. 4:1(b)(6) identifying with specificity:

    i.    The type of document.

    ii.   The number of pages in the document.

    iii.  The name and designation or capacity of the author/creator of the document.

    iv.   The name and designation or capacity of each recipient.

    v.    The date(s) of the information or the date(s) on which the document was prepared, created, sent, and/or shared.

4

vi. The title and/or description of the information or document.

vii. The subject matter(s) addressed in the information or document.

viii. The purpose(s) for which the information or document was prepared or communicated.

ix. The specific objection(s), privilege(s), and/or protection(s), if any, claimed as to the identification, description, and/or production of each and every individual document, along with the facts relied upon in support of the objection(s), privilege(s), and/or protection(s).

x. The persons having knowledge of any facts related to the claim of work product or privilege.

P.      These Requests are continuing in nature. You shall provide, as supplemental documents, such additional documents that you obtain or discover which will augment or otherwise modify your production given in response to these Requests. You shall make such supplemental productions promptly after discovery of such supplemental documents, but in any event prior to the date of trial.

Q.      Unless otherwise indicated below, the relevant time period for these Requests is from March 2, 2021through the present.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      All documents relating to any of the allegations in the Complaint, including but not limited to all documents that tend to support or refute the allegations.

2.      Your most recent curriculum vitae or resume.

3.      All documents and communications relating to PQA's organization and formation.

4.      All documents and communications relating PQA's business, operations, or

5

purpose.

5.      All documents and communications, including but not limited to organizational charts, sufficient to show PQA's organizational structure.

6.      All documents sufficient to identify PQA's current and/or former members, managers, and officers.

7.      All document concerning any funds provided to you to support your operations and expenses, including but not limited to loans, capital contributions, donations, and investments.

8.      All documents reflecting PQA's interest or concern regarding the integrity of the patent system.

9.      All documents and communications relating to PQA's mission or business plan including its goals and its plans to achieve them.

10.     All documents and communications relating to PQA's use, development, or sale of any product using the technology that is the subject of U.S. Patent No. 7,523,373 (the "'373 Patent") or U.S. Patent No. 7,725,759 (the "'759 Patent").

11.     All documents and communications relating to PQA's development or sale of any product.

12.     All documents and communications relating to PQA's funding, its potential or actual revenue and costs, and the future or actual allocation of any of its profits.

13.     PQA's quarterly and annual financial statements.

14.     All documents and communications relating to any IPR proceedings concerning the '373 Patent or the '759 Patent, including but not limited to the filing of any petition for, joinder in, settlement of, or potential termination of and such proceedings.

15.     All documents and communications relating to PQA's retention of and payment to

Dr. Adit Singh in connection with any IPR related to the '373 Patent.

16.     All non-privileged documents relating to PQA's retention of and payment to the Slayden Grubert Beard PLLC law firm in connection with any IPR related to the '373 Patent.

17.     All documents and communications relating to any real party-in-interest in any IPR proceedings concerning the '373 Patent or the '759 Patent, including but not limited to decisions made to list or not list any person or entity as a real party-in-interest.

18.     All documents and communications referring or relating to PQA including but not limited to all documents and communications relating to your association and work with PQA, your authority to speak or act on behalf of PQA, or your May 5, 2022 deposition, including but not limited to:

      i.   all correspondence with or relating to PQA;

      ii.   all agreements with or relating to PQA;

      iii.   all e-mails and text messages with or relating to PQA;

      iv.   all notes relating to PQA;

      v.   all documents ever provided to you by PQA;

      vi.   all documents ever provided by you to PQA;

      vii.   all calendar appointments relating to PQA; and

      viii.   all documents relating to any meetings or calls with PQA.

19.     All documents and communications referring or relating to Morgan Noble, including not limited to:

      i.   all correspondence with or relating to Morgan Noble;

      ii.   all agreements with or relating to Morgan Noble;

      iii.   all e-mails and text messages with or relating to Morgan Noble;

iv.  all notes relating to Morgan Noble;

v.  all documents ever provided to you by Morgan Noble;

vi.  all documents ever provided by you to Morgan Noble;

vii.  all calendar appointments relating to Morgan Noble; and

viii.  all documents relating to any meetings or calls with Morgan Noble.

20.    All documents referring, relating to, or evidencing any payments by you or anyone on your behalf to or from PQA, including but not limited to, all invoices, bills, statements of account, checks, receipts, expenses, expense lists, and documents evidencing wire or bank transfers or credit card payments, pay stubs, W-2s, 1099s, or any other evidence of payment or reimbursement made by you or anyone on your behalf to PQA or anyone on PQA's behalf or from PQA or anyone on PQA's behalf to you or anyone on your behalf.

21.    All documents and communications referring or relating to Intel, including but not limited to:

i.  all correspondence with or relating to Intel;

ii.  all agreements with or relating to Intel;

iii.  all e-mails and text messages with or relating to Intel;

iv.  all notes relating to Intel;

v.  all documents ever provided to you by Intel;

vi.  all documents ever provided by you to Intel;

vii.  all calendar appointments relating to Intel; and

viii.  all documents relating to any meetings or calls with Intel.

22.    All documents referring, relating to, or evidencing any payments by you or anyone on your behalf, or to you or anyone on your behalf, to or from Intel (directly or indirectly),

8

including but not limited to, all invoices, bills, statements of account, checks, receipts, expenses, expense lists, and documents evidencing wire or bank transfers or credit card payments, or any other evidence of payment or reimbursement made by you or anyone on your behalf to Intel or anyone on Intel's behalf or from Intel or anyone on Intel's behalf to you or anyone on your behalf.

23. All documents and communications referring or relating to Northwest Registered Agent, including but not limited to:

      i. all correspondence with or relating to Northwest Registered Agent;

      ii. all agreements with Northwest Registered Agent;

      iii. all e-mails and text messages with or relating to Northwest Registered Agent;

      iv. all notes relating to Northwest Registered Agent;

      v. all documents ever provided to you by Northwest Registered Agent;

      vi. all documents ever provided by you to Northwest Registered Agent;

      vii. all calendar appointments relating to Northwest Registered Agent; and

      viii. all documents relating to any meetings or calls with Northwest Registered Agent.

24. All documents and communications referring or relating to OpenSky, including but not limited to:

      i. all correspondence with or relating to OpenSky;

      ii. all agreements with or relating to OpenSky;

      iii. all e-mails and text messages with or relating to OpenSky;

      iv. all notes relating to OpenSky;

      v. all documents ever provided to you by OpenSky;

      vi.  all documents ever provided by you to OpenSky;

     vii.  all calendar appointments relating to OpenSky; and

    viii.  all documents relating to any meetings or calls with OpenSky.

25.     All documents and communications referring or relating to VLSI, including but not limited to:

       i.  all correspondence with or relating to VLSI;

      ii.  all agreements with or relating to VLSI;

     iii.  all e-mails and text messages with or relating to VLSI;

     iv.  all notes relating to VLSI;

      v.  all documents ever provided to you by VLSI;

      vi.  all documents ever provided by you to VLSI;

     vii.  all calendar appointments relating to VLSI; and

    viii.  all documents relating to any meetings or calls with VLSI.

February 5, 2024

Ellen D. Marcus (Virginia Bar No. 44314)
HOLMES COSTIN & MARCUS PLLC
908 King Street, Suite 330
Alexandria, Virginia 22314
(703) 991-7951
emarcus@hcmlawva.com

Michael S. Schachter (*pro hac vice* application
forthcoming)
Steven J. Ballew (*pro hac vice* application
forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019
(212) 728-8000
mschachter@willkie.com
sballew@willkie.com

Joshua L. Solomon (*pro hac vice* application
forthcoming)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, Massachusetts 02116
jsolomon@pdsfirm.com
(617) 960-0556

*Counsel to Plaintiff VLSI Technology LLC*

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA

VLSI TECHNOLOGY LLC,

        Plaintiff,

    v.

                                    Civil Action No. CL 24001093

PATENT QUALITY ASSURANCE, LLC and
JOSEPH URADNIK,

        Defendants.

### PLAINTIFF'S FIRST SET OF INTERROGATORIES
### TO JOSEPH URADNIK

    COMES NOW the plaintiff, VLSI Technology LLC ("VLSI"), by counsel, and pursuant

to Rule 4:8 of the Supreme Court of Virginia, requesting that the defendant, Joseph Uradnik,

answer this First Set of Interrogatories (the "Interrogatories") within twenty-eight (28) days of the

date of service hereof. Each Interrogatory shall be answered fully, in writing, under oath, and in

accordance with the following Definitions and Instructions.

    If you fail to answer any of these Interrogatories, or if your responses are otherwise

insufficient, VLSI may move for an Order to Compel which, if granted by the Court with a finding

that your refusal or failure to sufficiently answer was without substantial justification, may require

you, your attorney, or both, to pay the expenses that VLSI reasonably incurred in obtaining the

Order to Compel, including but not limited to its reasonable attorney's fees.

### DEFINITIONS AND INSTRUCTIONS

    A.    The terms **"Uradnik," "you,"** and **"your"** mean the defendant Joseph Uradnik, as

well as his accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees,

representatives, and any other person or entity under Uradnik's direction or control.

B.      The terms **"plaintiff"** and **"VLSI"** mean VLSI Technology LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, members, managers, officers, representatives, and any other person or entity under VLSI's direction or control.

C.      The term **"PQA,"** means the defendant Patent Quality Assurance, LLC, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, employees, managers, members, officers, representatives, and any other person or entity under PQA's direction or control.

D.      The term **"Intel"** means Intel Corporation, as well as its accountants, agents, assigns, attorneys, bankers, consultants, contractors, directors, employees, officers, representatives, and any other person or entity under Intel's direction or control.

E.      The term **"communication"** means any disclosure, transfer or exchange of information or opinion, however made.

F.      The term **"document"** means any handwritten, recorded, graphic, photographic, printed, typed or otherwise transcribed matter, whether on paper, tape, cards, disks, drives, charts, cloud storage, film, magnetic storage, or any other medium or detection device. By way of illustration, and in no way limiting the scope of the term, **"document"** includes all written communications, agreements, calendars and planners (electronic or hard copy), bills, bulletins, books, bookkeeping entries, charts, checks, code, contracts, data compilations, data sheets, demands, diaries, directives, direct messages, disks, drafts, drawings, drives, e-mails, electronic files, expense reimbursement statements, financial journals, financial statements, instant messages, ledgers, letters, literature, log books, logs, notebooks, notes, notices, photographs, presentations (including PowerPoint presentations), printouts, receipts, recordings, records, reports, research,

screenshots, slide decks, slideshows, social media posts, speeches, spreadsheets, software,

statements, statistics, telegrams, text messages, transcriptions, videos, word processing documents,

work assignments and work sheets, whether prepared by you or on your behalf for your own use

or for transmittal, or received by you, and wherever located. The word "**document**" also includes

all copies unless such copies (including any marks thereon) are exact duplicates of documents that

are produced.

      G.    The terms "**refer**" and "**relate**," as to any given subject, mean anything that

constitutes, contains, embodies, reflects, identifies, states, deals with, or is in any manner

whatsoever pertinent to the subject, including, but not limited to, documents concerning the

preparation of any documents.

      H.    The term "**agreement**" means a contract, arrangement or understanding, formal or

informal, oral or written, between two or more persons.

      I.    The term "**person**" means any natural person, corporation, company, partnership,

joint venture, firm, association, or any other business or legal entity, whether private or

governmental.

      J.    The terms "**identify**" and "**describe**":

        1.  As applied to an <u>individual</u>, mean to give his or her name, last known address, and employer;

        2.  As applied to an <u>entity</u> other than an individual, mean to give the legal name and trade name of the entity, the nature of the entity (corporation, partnership, limited liability company, trust, etc.), and the full address of its principal place of business;

        3.  As applied to a <u>document</u>, mean to give its date, its author(s), its recipient(s) (including "cc:" and "bcc:" recipients), its nature (*e.g.*, contract, note, check, letter), its control number (if any), its last known location, and its present custodian;

        4.  As applied to a <u>conversation</u>, <u>statement</u>, <u>admission</u>, <u>negotiation</u>, or <u>oral communication</u>, mean to give the substance of the conversation, statement,

3

admission, negotiation, or oral communication, the time, date, and place of the conversation, statement, admission, negotiation, or oral communication, to identify the speaker or author, to identify any individuals present, and to identify any documents reflecting, summarizing, or relating to the conversation, statement, admission, negotiation, or oral communication;

5. As applied to a transaction, mean to give the date of the transaction, to identify the parties to the transaction, to identify the nature of the transaction, to state its purported and actual purpose, to state the amount of the transaction, and to identify all documents that summarize, reflect, or constitute the transaction;

6. As applied to an act or action, mean to state what occurred, the time, date, and place at which it occurred, to identify the individual or entity taking the action, and to identify all individuals present or otherwise observing the act or action;

7. As applied to a contract or agreement, mean to identify all documents constituting the contract or agreement, including without limitation any attachments, exhibits, and any other documents or information referenced therein whether expressly incorporated therein or not; all parties to the contract or agreement or any persons involved in solicitation of information relating thereto or the negotiation thereof; the date of the contract or agreement; and all terms and conditions of the contract, lease, or agreement not set forth in identified documents

8. As applied to an occasion, mean to identify the time, date, place, and surrounding circumstances attendant thereto, as well as all individuals or entities present and the substance of their participation or role with respect thereto.

K.      Unless otherwise defined in these Interrogatories, terms and acronyms have the same meaning as they do in that pleading.

L.      Each use of the singular form herein shall be deemed to include the plural form and vice versa. Use of the word "or" includes the word "and," and vice versa.

M.      Your answers to these Interrogatories should be to the best of your knowledge, recollection, and belief. Such knowledge includes the knowledge of your accountants, agents, assigns, attorneys, consultants, contractors, directors, employees, managers, members, officers, representatives, and any other person or entity under your control.

N.      Where any answer is based on information other than your personal knowledge,

4

specify the source and basis of all facts and information contained in the answer.

      O.    All objections as to any claim of work product or privilege of any kind shall:

          1.  Specifically state the nature of the claim of work product or privilege;

          2.  State the facts relied upon in support of the claim of work product or privilege;

          3.  Identify any documents relating to the claim of work product or privilege; and

          4.  Identify all persons having knowledge of any facts related to the claim of work product or privilege.

      P.    These Interrogatories are continuing in nature. You shall provide supplemental answers should you obtain or discover information which will augment or otherwise modify your answers in response to these Interrogatories, and shall do so promptly, but in any event prior to the date of trial.

      Q.    Unless otherwise indicated below, the relevant time period for these Interrogatories is from March 2, 2021 through the present.

## INTERROGATORIES

      1.    Identify the point in time in which you were first contacted about participating in an IPR proceeding challenging the '373 Patent.

      2.    Describe in detail your relationship with any natural person associated with PQA, and include in your description the identities of all such natural persons, where you met such persons, how long you have known such persons, and how frequently you communicate with such persons.

      3.    Describe in detail your relationship with any natural person associated with Intel, and include in your description the identities of all such natural persons, where you met such persons, how long you have known such persons, and how frequently you communicate with such persons.

4.      Describe in detail your relationship with PQA, including how you came to be an "authorized representative" of PQA, any compensation arrangements you have ever had with PQA or with anyone else in exchange for your services for PQA, any title you have ever held with PQA, and any membership or ownership interest you have in PQA.

5.      Identify all persons who helped you prepare for or otherwise discussed with you how to respond to questions asked during your May 5, 2022 deposition.

6.      Identify each electronic device that you used to communicate with any person about PQA's formation or its IPR challenging VLSI's patents. For each electronic device, identify with specificity: (1) the applications that you used for the foregoing communications; and (2) the carrier or wireless service provider associated with that device.

7.      Identify each e-mail address, phone number, and username you used to communicate with any person about PQA's formation or its IPRs challenging VLSI's patents. For each e-mail address, phone number, and username, identify with specificity the associated internet service provider, carrier, or wireless provider.

February 5, 2024

_Ellen D. Marcus (Virginia Bar No. 44314)_
HOLMES COSTIN & MARCUS PLLC
908 King Street, Suite 330
Alexandria, Virginia 22314
(703) 991-7951
emarcus@hcmlawva.com

Michael S. Schachter (*pro hac vice* application
forthcoming)
Steven J. Ballew (*pro hac vice* application
forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019
(212) 728-8000
mschachter@willkie.com
sballew@willkie.com

Joshua L. Solomon (*pro hac vice* application
forthcoming)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, Massachusetts 02116
jsolomon@pdsfirm.com
(617) 960-0556

*Counsel to Plaintiff VLSI Technology LLC*